**L. W. FERRELL and Jo Ferrell, Next Friends of Phillip Ferrell, et al., Appellants,**

v.

**DALLAS INDEPENDENT SCHOOL DISTRICT et al., Appellees.**

No. 24301.

United States Court of Appeals Fifth Circuit.

March 29, 1968.

Rehearing Denied April 30, 1968.

**698**

————◆————

W. D. Masterson, III, Dallas, Tex., for appellants.

Franklin E. Spafford, Warren Whitham, Dallas, Tex., for appellees.

William F. Wessell, New Orleans, La., amicus curiae.

Before TUTTLE, GEWIN and GODBOLD, Circuit Judges.

GEWIN, Circuit Judge:

Appellants, Phillip Ferrell, Stephen Webb and Paul Jarvis, all minors, were denied enrollment at the W. W. Samuell High School of Dallas, Texas, because of their "Beatle" type haircuts. Suit was brought on September 12, 1966, in the United States District Court for the Northern District of Texas by their natural parents as next friends against the Dallas Independent School District for injunctive relief. Appellants' application for a temporary restraining order was granted by the district court on September 13. However, following a full and complete hearing on the matter, the court dissolved the temporary restraining order and denied appellants' motion for a temporary injunction. 261 F.Supp. 545. We affirm.

Appellants contend that the school's regulation requiring them to cut or trim their hair as a prerequisite to enrollment is (1) unlawful under the laws and constitution of the State of Texas, (2) a denial of due process under the fourteenth amendment and (3) is discriminatory under the Civil Rights Act, 42 U.S.C. §§ 1981 and 1983. Before we resolve these several contentions, we feel that a detailed statement of the facts of this case is necessary.

Appellants are members of a musical group or combo known as "Sounds Unlimited". Each has what is commonly known as a Beatle type haircut.[1] Appellants are of the opinion that their hair style conforms to the standards, customs and usage within the field of entertainment and is a necessary element of attraction and performance.[2]

---

1. The hair styles of appellants are described in the following excerpt from the trial court's opinion:

    "As described by the mother of Stephen Webb, who was 18 years of age on September 7, 1966, Stephen's hair 'is over his ears, but one can see the lobe of his ear. It is not over his collar, but is over his forehead and down to his eyebrows.' As described by the mother of Paul Jarvis, 'his hair is about 1 inch over his ears and about 1½ inches above his eyebrows.' Phillip Ferrell's hair, if hanging straight forward, would come below his eye brows, but is combed and turned to the side so as to be a very short distance above his eyebrows. The hair extends down to the ear lobe on the side and to the collar in the back. This hair style adopted by these plaintiffs is in conformity with the so-called 'Beatle' type hair style."

2. A portion of the contract between appellants and their business manager, Mr. Alexander, reads as follows:

    "It is further understood and agreed between Agent and Principle that Principle and each member of Principles organization [sic] shall maintain their dress and personnal [sic] appearance in conformity with accepted STANDARDS and CUSTOMS OF ROCK & ROLL GROUPS, COMBO'S & BANDS including so called BEATLE TYPE HAIR STYLES."

    Certainly we are aware that such contract is unenforceable against appellants,

Prior to the commencement of the 1966–67 school year, appellants were aware that the length and style of their hair would be objectionable to school authorities. In fact, one of them, Paul Jarvis, had cut his hair so as to attend summer school during the summer of 1966.

Enrollment in the W. W. Samuell High School for the school year 1966–67 was scheduled for September 7. On the evening of September 6, the business manager or booking agent of Sounds Unlimited, Mr. Kent Alexander, sometimes referred to as "Alexander the Great," called the school principal, Mr. W. S. Lanham, at his home to discuss the matter of enrollment. He advised the principal that he had $4,000.00 invested in appellants and planned to invest an additional $1,000. Mr. Alexander also advised the principal that he was coming to the school in connection with appellants' enrollment. However, he was told that the principal would talk only to the boys and their parents. Mr. Alexander then stated that he would bring the radio and television media to the school.

To enroll, students had been informed to report to their previously assigned homerooms on September 7. Contrary to this usual procedure of enrollment, the appellants accompanied by the mothers of two of them and Mr. Alexander went to the principal's office.[3] A conference was held between the principal, the boys and the two mothers, Mr. Alexander being excluded.[4] At this conference there was a discussion about the boys' rights, school discipline and the principal's position. The principal informed the parties that pursuant to authority delegated to him as principal by the Dallas Independent School District he had established rules and regulations concerning the appearance of students at the school.[5] It was the opinion of the principal that the length and style of the boys' hair would cause commotion, trouble, distraction and a disturbance in the school and, therefore, it was necessary for their hair to be cut or trimmed before admittance would be allowed. Appellants advised the principal that they would not cut their hair. Accordingly, Stephen Webb and Phillip Ferrell were thereupon denied admission to the school. Paul Jarvis, whose hair had not yet attained the length of the other two, having been previously trimmed for summer school, was not refused admission until later at which time his hair had apparently grown to a point where in the opinion of the principal it would be a disturbing influence in the school.

all of them being minors. 30 Tex.Jur.2d 678, Infants, § 19, et seq. However, such contractual terms do indicate the importance of hair style as to the several parties to the contract.

3. The record reveals two reasons as to why the boys went to the principal's office rather than reporting to their homerooms as was the custom. Two of the boys testified that they preferred getting the matter of their hair settled from the beginning rather than running the risk of being confronted with it later or sneaking around school trying to avoid detection. The third boy testified that he was advised by Mrs. Gilbert, Dean of Girls, that he would not be admitted to school on account of his hair but would have to go directly to Mr. Matthews, Assistant Principal, or Mr. Lanham in order to be admitted.

4. Apparently there was some confusion as to Mr. Alexander's status on the day of the conference. It appears from the record that he was present as a representative of Mr. Jarvis, Paul's father, with authority to speak for Mr. Jarvis. However it seems that in the confusion this fact was not clearly understood by the school authorities. At any rate, Mr. Alexander was not permitted to attend the conference.

5. Apparently the school also had rules and policies with respect to other aspects of attire and appearance. Girls have been sent home to change their dress because of body exposure; they have been required to remove excessive "make-up" such as too much paint and false eyelashes; they are expected to wear dresses and not tight fitting pants; and were required to wear shoes and not come to school barefooted.

True to his word, Mr. Alexander had called newspapers, radio stations and television stations to be present at the school on September 7. At the conclusion of the conference in the principal's office, the boys left the school building and proceeded to the sidewalk on the west side of the school grounds where the three boys and Mr. Alexander held a press interview, and pictures, motion pictures and sound tapes were made.

Later the three boys went to a recording studio to write and record a "protest" song about the matter. The recording was completed and the record entitled "Keep Your Hands Off It"[6] was first played on the air Friday morning, September 9. For several days thereafter it was played numerous times on several radio stations.

Administrative procedures established by the Dallas Independent School District for review of a principal's ruling include appeal to the Assistant Superintendent of Administration, then to the Superintendent of Schools and finally to the Board of Education. Efforts were made by or on behalf of the appellants to present their problem to higher school authorities. A conversation on September 7 between the three boys and the Assistant Superintendent of Administration was held on the steps of the school administration building. Appellants went to the office of the Superintendent of Schools but the Superintendent was not there at the time. Later their attorney discussed the matter by telephone with the Superintendent. The attorney was advised that the Superintendent would support the principal's ruling. The President of the Board of Education made a public statement over television that the Superintendent would be backed by the Dallas School Board and that he approved the action of the principal. On September 8 and 9 the boys inquired into the possibility of transferring schools. They were informed by the principal that since the next period for acceptance of applications for transfer did not begin until September 21, he could not take an application for a transfer at that time. The boys also went to seven different schools on September 8 seeking to be admitted, but were unsuccessful.

At the hearing held in the district court much testimony was given regarding the fact that the wearing of long hair by young men and boys is currently in vogue. This fact was said to be especially true in the case of youthful entertainers, particularly rock and roll musicians. The object of such testimony was to demonstrate that long hair was no longer a rare or unusual feature among teenagers and that it had become well accepted by the younger generation.

Nevertheless, Mr. Lanham had a different story to tell about long hair. He recited several examples of the problems caused by boys wearing the Beatle type hair style in school. On one occasion a group of boys in his school had decided that a classmate's hair was too long and that they were going to take the matter in their own hands and trim it themselves. Mr. Lanham stated that boys with long hair were subjected to substantial harassment. Obscene language had been used by some students in reference to others with long hair and girls had come to his office complaining about the language being used. The long hair boys had also been challenged to a fight

6. The words of the recording are as follows:
"Went to school, got kicked out,
said it was too long, now we're going to shout.
[Chorus] Keep your hands off of it,
keep your hands off of it,
keep your hands off of it,
it don't belong to you.
Bopped upon the steps, the principal I met,
your're not getting in, now what do want to bet.
[Chorus]
Went this morning, tried to get in,
the kids were for us, but we still couldn't win.
[Chorus]
HAIR, THAT IS!"

by other boys who did not like long hair. Also, long hair boys had been told by others that the girl's restroom was right down the hall. Mr. Lanham mentioned one long hair boy who refused to go to the boy's restroom until the other boys had left. He referred to other incidents where the boys would eat in the lunchroom only with the girls and never eat with the boys.

Several students, sporting a Beatle type haircut also testified at the hearing. Some testified that they had encountered no problems with regard to their hair. However, some of these boys stated that remarks had been made to them by other boys about their hair. Also one student admitted a fight had ensued over the fact that the football "guys" at the school did not like long hair.

During the hearing Mr. Lanham stated on numerous occasions that his decision to refuse appellants admission to school was based solely on the length and style of their hair and was not influenced by other considerations. Appellants' attorney tried in vain to establish that the principal's decision was based, in part, on the actions of Mr. Alexander in calling his home on the evening of September 6 and in alerting the press the next day and the fact that appellants had recorded a protest song about the matter. However, Mr. Lanham did state that he felt that Mr. Alexander by calling him at his home the evening before enrollment had challenged him. Further, Mr. Lanham stated that he viewed the recording made by appellants as directed towards him personally rather than just a general protest song about hair, and that the recording held him up to ridicule, and that he did not particularly appreciate it. He related the fact that other people had commented on the record and had observed that it did refer to him.

The district court concluded that the school authorities had not acted arbitrarily, capriciously nor unreasonably in refusing to admit appellants to Samuell High School, and therefore, the court denied appellants' application for injunctive relief.

Appellants contend that the action of the school authorities was unlawful under the constitution and laws of the State of Texas. We do not agree.

The Constitution of Texas, Article 7, § 1, Vernon's Ann.Stat., is as follows:

"A general diffusion of knowledge being essential to the preservation of the liberties and rights of the people, it shall be the duty of the Legislature of the State to establish and make suitable provision for the support and maintenance of an efficient system of public free schools."

Pursuant to this authority, the legislature did so establish a state system of public schools. The legislature also, again pursuant to the constitutional mandate, authorized the authorities of the various public schools so established to adopt such rules and regulations as they deemed proper in order to effectively manage and govern the schools. See Article 2780, Revised Civil Statutes of Texas which provides in part:

"Said trustees shall adopt such rules, regulations and by-laws as they may deem proper; and the public free schools of such independent district shall be under their control; and they shall have the exclusive power to manage and govern said schools, * * *."

The constitutional grant of power and authority to school officials was thoroughly discussed by the Texas Court of Civil Appeals in Wilson v. Abilene Indep. School Dist., 190 S.W.2d 406 (1945) in its decision upholding the action of the school which, in effect, prohibited students from having membership in high school fraternities and sororities. We quote from the Texas court's opinion at page 412:

"It will be seen that the grant of power and authority to school boards is in general terms. The Legislature could not possibly foresee all problems and situations that would arise in the administration of the schools.

\* \* \* \* \* \*

But, necessarily, school boards are given a wide discretion in such matters. They may make all such rules and regulations as in their judgment are necessary to maintain an 'efficient' system of schools, subject to the limitation that there be no abuse of discretion, and that such regulations be not arbitrary, unreasonable or in violation of law."

See also Waugh v. Board of Trustees of University of Mississippi, 237 U.S. 589, 35 S.Ct. 720, 59 L.Ed. 1131.

■ In view of the testimony of Mr. Lanham as to the various problems which arise in the school due to the wearing of long hair by members of the student body and the testimony of certain students that their hair style had indeed created some problems during school hours, we cannot say that the requirement that appellants trim their hair as a prerequisite to enrollment is arbitrary, unreasonable or an abuse of discretion. Therefore, the school regulation as promulgated by the principal, banning long hair, is not violative of the state constitution or statutes.

Appellants also contend that the action of the school authorities was a denial of substantive and procedural due process under the fourteenth amendment. We conclude, after careful and thoughtful study, that the action complained of does not violate the fourteenth amendment.

Appellants categorize the length and style of their hair as a form of expression, not unlike that of thought and speech, which is constitutionally protected from infringement by the state. We shall assume, though we do not decide, for the purpose of this opinion that a hair style is a constitutionally protected mode of expression. Consequently we are confronted with the question whether a state can prohibit this type of expression in the circumstances here present without running afoul of the fourteenth amendment.

■ This case brings into focus a sensitive area of the law. Constitutional issues which arise under the Bill of Rights have been before the courts many times. The decided cases clearly demonstrate that each case must be decided in its own particular setting and factual background and within the context of the entire record before the court in determining whether the rule or the action about which complaint is made is arbitrary, capricious, unreasonable or discriminatory. This approach to the problem is clearly demonstrated by the authorities hereinafter cited as well as the following: Thornhill v. State of Alabama, 310 U.S. 88, 101, 60 S.Ct. 736, 84 L.Ed. 1093, 1102; West Virginia State Board of Education v. Barnette, 319 U.S. 624, 627, 63 S.Ct. 1178, 87 L.Ed. 1628, 1637; Dennis v. United States, 341 U.S. 494, 510, 71 S.Ct. 857, 868, 95 L.Ed. 1137, 1153; Whitney v. People of the State of California, 274 U.S. 357, 376, 47 S.Ct. 641, 71 L.Ed. 1095, 1106. In Dennis v. United States, supra, the Supreme Court approved, as a general rule, the following statement by Chief Judge Learned Hand:

"In each case [courts] must ask whether the gravity of the 'evil,' discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger."

■ The Constitution does not establish an absolute right to free expression of ideas, though some might disagree.[7] The constitutional right to free exercise of speech, press, assembly, and re-

---

7. Mr. Justice Black made the following statement in his dissent in Ginzburg v. United States, 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31 (1966):

"\* \* \* as I have said many times, I believe the Federal Government is without any power whatever under the Constitution to put any type of burden on speech and expression of ideas of any kind (as distinguished from conduct), \* \* \*."

ligion may be infringed by the state if there are compelling reasons to do so.[8]

■ The compelling reason for the State infringement with which we deal is obvious. [The interest of the state in maintaining an effective and efficient school system is of paramount importance. That which so interferes or hinders the state in providing the best education possible for its people, must be eliminated or circumscribed as needed. This is true even when that which is condemned is the exercise of a constitutionally protected right.]

In Blackwell v. Issaquena County Board of Ed., 363 F.2d 749 (5 Cir. 1966) we denied school children the right to wear freedom buttons to school. Unquestionably those wearing the buttons were exercising their protected rights of free speech and free communication of ideas. However, we upheld the school's rule prohibiting the wearing of the buttons during school hours on the ground that the evidence clearly demonstrated that such activity interfered with the efficient operation of the school.[9]

Several cases have been before the courts with factual situations similar to the instant case. In each the students were denied admission to or suspended from school until they acquired an acceptable haircut. The students contended, inter alia, that the school's regulation was unconstitutional, that it was unreasonable or arbitrary, and that it was an invasion of the right of privacy. These contentions were rejected by the courts in Leonard v. School Committee of Attleboro, 349 Mass. 704, 212 N.E.2d 468 (1965) and Marshall v. Oliver Case No. B-2932, Cir. Ct. of the City of Richmond, Dec. 20, 1965.[10] In both cases the court held that the regulation which barred a student with an extreme haircut because of its length and style was not unreasonable or arbitrary in that the regulation was reasonably calculated to maintain school discipline. However, the district court in Zachry v. Brown (N.D. Ala., No. 66–719, June 30, 1967, unpublished) agreed with plaintiffs, who were suspended from Jefferson State Junior College, a public institution of the State of Alabama, for failure to conform to regulations pertaining to permissible hair styles, that such regulation was unreasonable and failed to "pass constitutional muster." However, the district judge clearly pointed out in his opinion that such regulation was promulgated solely because the school administrators thoroughly disliked what they considered exotic hair styles. No suggestion was made that such haircut had any effect upon the health, discipline, or decorum of the institution. Thus *Zachry* is essentially different from this case.

We conclude that there was no denial of substantive due process; and further, we find no evidence in the record to support appellants' contention that they were denied procedural due process.

■ We recognize that appellants are professional musicians performing as a musical combo. Their right to follow this chosen business or occupation free from unreasonable governmental interference comes within the liberty and property concepts of the Fifth Amendment. Greene v. McElroy, 360 U.S. 474,

8. For example, see Konigsberg v. State Bar of California, 366 U.S. 36, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961); Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244 (1879).

9. Compare Burnside v. Byars, 363 F.2d 744 (5 Cir. 1966) where the right to wear freedom buttons was not denied the school children because there was a lack of evidence that such conduct constituted any interference with the educational process.

10. The opinion of the trial court is apparently not published and the Supreme Court of Appeals of Virginia denied certiorari without opinion. The United States Supreme Court also denied certiorari. 385 U.S. 945, 87 S.Ct. 319, 17 L.Ed. 225. The opinion of the trial court is set forth in an appendix to appellee's brief.

79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959). The action taken by the school authorities does not, in our view, interfere with appellants' right to continue in their chosen occupation of professional rock and roll musicians. It is common knowledge that many performers are required to use special attire and make-up, including wigs or hairpieces, for their public appearances. At this stage in appellants' lives school may be more important than their commercial activities. In any event, we do not feel that their business activity is eliminated, as a practical matter because of the school's rules and regulations.

■ Appellants' final contention is that the school regulation is discriminatory under the Civil Rights Act, 42 U.S.C. §§ 1981 and 1983. We find no violation of the civil rights statutes. Byrd v. Sexton, 277 F.2d 418 (8 Cir. 1960).

■ As noted earlier the district court conducted a full and extensive hearing during which a number of witnesses appeared and documentary evidence was introduced. The parties were afforded ample opportunity to present their evidence and the facts were fully developed. The parties clearly presented the controlling legal authorities to the court. Thereafter, the court rendered a full opinion in which there were findings of fact and conclusions of law, denying the motion of the appellants for a temporary injunction. We are unable to find an abuse of discretion. Brewer v. Huger, 358 F.2d 739 (5 Cir. 1966); United States v. Edwards, 333 F.2d 575 (5 Cir. 1964); Detroit Football Company v. Robinson, 283 F.2d 657 (5 Cir. 1960).

For the several reasons hereinabove discussed, we affirm the judgment of the district court.

Judgment affirmed.

GODBOLD, Circuit Judge (specially concurring):

I concur fully in the opinion of Judge Gewin and add some views of my own.

The American community groups together in its schools hundreds, even thousands, of energetic, volatile and sometimes aggressive young people in close contact with one another and in confined areas, during a substantial part of each school day for three fourths of each year and twelve years of their lives.

The bare process of teaching them in the traditional sense demands the best that the profession can offer. But in addition we call upon the schools to give our children driver training, vocational skills, public speaking, music instruction, and sex education, and to maintain their physical fitness, to carry on everbroadening athletic programs, engage in fund raising, and plan, produce and chaperone social events. Whether it should or should not do so, the American community calls upon its schools to, in substance, stand *in loco parentis* to its children for many hours of each school week.

Citizens expect and demand that their children be physically safe in the schools to whose supervision they are consigned, and the citizenry is outraged if the schools are less than safe and orderly. At the same time we expect that the requirements of order, and of protection and implementation of the educational program of the school, will be met by limited enforcement means—the force of the school establishment itself and the school-related disciplines of reprimand, suspension, and expulsion—recognizing that the schoolroom is an inappropriate place for the policeman to be either called or needed.

A school may not stifle dissent because the subject matter is out of favor. Free expression is itself a vital part of the educational process. But in measuring the appropriateness and reasonableness of school regulations against the constitutional protections of the First and Fourteenth Amendments the courts must give full credence to the role and purposes of the schools and of the tools with which it is expected that they deal with their problems, and careful recognition to the differences between what are rea-

sonable restraints in the classroom and what are reasonable restraints on the street corner.]

TUTTLE, Circuit Judge (dissenting):

With deference to the views of my colleagues, I dissent. It does seem as though this issue is something of a tempest in a teapot. However, we are faced with the problem of three teenage school children in Dallas, Texas, being denied a high school education because the length of their hair did not suit the school authorities. Upon the assumption made by the court in its opinion that "for the purpose of this opinion a hairstyle is a constitutionally protected mode of expression," I would say that there is no countervailing state need or requirement that would warrant such interference with the constitutional first amendment right under the standard adopted by the Court in the quotation from Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137: "In each case [courts] must ask whether the gravity of the 'evil,' discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger."

Moreover, even though the method of wearing the hair is not constitutionally protected under the First Amendment, it appears to me, without the slightest doubt that this is an utterly unreasonable classification of students by the state in granting or denying the right of a public education. This of course, if true, is violative of the Fourteenth Amendment.

So far as the majority opinion finds support in Blackwell v. Issaquena County Board of Education, 363 F.2d 749, I take this first opportunity, with deference, to note my disagreement with the holding

there.[1] I think both in that case and upon the record before us here, we find courts too prone to permit a curtailment of a constitutional right of a dissenter, because of the likelihood that it will bring disorder, resistance or improper and even violent action by those supporting the status quo. It seems to me it cannot be said too often that the constitutional rights of an individual cannot be denied him because his exercise of them produces violent reaction by those who would deprive him of the very rights he seeks to assert. In Terminiello v. City of Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131, the United States Supreme Court said:

"Accordingly a function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute, Chaplinsky v. New Hampshire, supra, 315 U.S. [568] at pages 571–572, 62 S.Ct. [766] at page 769, 86 L.Ed. 1031, is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest. * * * There is no room under our Constitution for a more restrictive view. * * * The ordinance as construed by the trial court seriously invaded this province. It permitted conviction of petitioner if his speech stirred people to anger, invited public

1. In *Issaquena* the trial court denied an injunction to prohibit the continued suspension of some 300 Mississippi students for wearing "freedom" buttons. It will be noted that the opinion of this court affirming the judgment cited at length, in three footnotes, disorderly conduct by *some* of the button-wearing students,

*after* the principal had issued his order to the original small number of wearers to stop wearing the buttons. No effort was made to discipline the small number of button-wearers who created noise and disturbance. Instead the principal struck at the idea of wearing the buttons itself.

dispute, or brought about a condition of unrest. A conviction resting on any of those grounds may not stand."

These boys were not barred from school because of any actions carried out by them which were of themselves a disturbance of the peace. They were barred because it was anticipated, by reason of previous experiences, that their fellow students in some instances would do things that would disrupt the serenity or calm of the school. It is these acts that should be prohibited, not the expressions of individuality by the suspended students.