[Civ. No. 24453.   First Dist., Div. Four.   Feb. 10, 1969.]

GREGOR MYERS, a Minor, etc., Plaintiff and Respondent, v. ARCATA UNION HIGH SCHOOL DISTRICT et al., Defendants and Appellants.

Raymond Schneider, County Counsel, Mathews, Traverse & McKittrick and James R. McKittrick for Defendants and Appellants.

Lawrence A. Truitt and Jerome B. Falk, Jr., for Plaintiff and Respondent.

Marshall W. Krause and Paul N. Halvonik as Amici Curiae on behalf of Plaintiff and Respondent.

RATTIGAN, J.—Petitioner Gregor Myers, a minor and a student at Arcata High School, was suspended from attendance because of the length of his hair. He brought this action in mandamus, through his mother as guardian ad litem and against the school authorities, to compel his reinstatement. Defendants appeal from the trial court's order directing issuance of a writ of mandate as prayed.

Defendants are the school district which maintains Arcata High School, the five elected members of the governing board of the district, the district superintendent, and the principal and the vice-principal of the school. Petitioner was 15 years old in 1966. In his petition, he alleged that on October 19, 1966, he was a "student regularly attending . . . Arcata High School"; that Ramon A. Fauria, the school's vice-principal, suspended him on that date "for not abiding by the school policy regarding personal appearance"; that the suspension was subsequently approved by the school district governing board; and that it was "arbitrary and capricious."

The trial court issued an alternative writ of mandate when the action was commenced. Defendants answered the petition. They admitted the fact of petitioner's suspension, but alleged in substance that he had been suspended because the length of his hair violated a "regulation . . . with respect to student dress and appearance" which the governing board had duly adopted pursuant to its rulemaking power as set forth in section 10604 of the Education Code. The answer pleaded the text of the "regulation," which is hereinafter quoted in full. Defendants further alleged that "extremes" in hair style of both boy and girl students are "disruptive" of the educational function of a school, and that petitioner's hair style had this effect at Arcata High School. They also denied that petitioner was a "student regularly . . . attending" the school, and raised issues concerning his nonresidence in the Arcata Union High School District.

It was established at the trial that petitioner was suspended because the length of his hair violated that portion of the school's "dress policy" which provided that "extremes of hair styles are not acceptable." The full text of the "policy" appeared in a "Student Handbook" (and, apparently, in no other formal source). Petitioner had received a copy of the handbook, as had all students. A copy was received in evidence at the trial. The "dress policy," as identified in the testimony of the district superintendent, is stated in the open-

ing paragraphs of part V of the handbook. These paragraphs read as follows:

## "V. School Policies

"Campus Clothes—Extremes of dress and personal appearance are not conducive to the well being of all. Simplicity, neatness, cleanliness, and good taste are the keynote for school dress. Excessive tightness in clothes as well as extremes in shirt tails and similarly, *extremes of hair styles are not acceptable.*

"Girls shall wear skirts and blouses or sweaters or appropriate dresses. Girls [*sic*] clothes shall fit properly and be in current taste and style.

"Boys shall wear conventional slacks or jeans properly adjusted. Shirts shall be buttoned to within one button of the collar. Shirt tails with a square cut or with a soft curve designed for outside wear and in good taste are acceptable wear.

"Extremes in dress, in style, and in individual taste are to be avoided." (Italics added.)[1]

The evidence at the trial did show that "regulations" were enforced by the school principal "and his delegated authority." In practice, the principal's "delegated authority" was the vice-principal, Mr. Fauria. Fauria testified that the school's physical education department acted as a screening group for him on the subject of student hair styles: "They identify students with the extreme hair styles . . . they talk

---

[1]The district superintendent testified that the board had adopted "broad" policy (relative to student dress and appearance) in March of 1965, and that school "regulations," on dress and appearance and "within the bounds of the policy" were then developed by "a combination of the students and the faculty" and submitted to him (the superintendent) for approval. He testified that the board's "policy" was the "first part" of the text of part V of the student handbook (quoted *supra*), and that all four paragraphs were "within" the policy, but he did not identify which paragraphs or sentences thereof were board "policy" and which were student-faculty "regulations." He expressly stated, however, that the "policy" and the "regulations" were not the same thing.

The student handbook, a mimeographed pamphlet, does not identify its source. A frontispiece tells the reader-student that "This book contains interesting information for you. You should keep it for reference." This message is unsigned, and the pamphlet does not state at any point under whose auspices it is published. Of its seven parts, those other than part V are respectively entitled "Student Organization," "A[rcata] H[igh] S[chool] Clubs, and Activities," "Student Services," "Attendance Procedures," "General Information" and "Grading and Graduation."

By reason of the foregoing, it is not at all clear that the statement "extremes of hair styles are not acceptable" is a "policy" or "regulation" enacted by the governing board as alleged in defendants' answer.

to the student first, they try to get their cooperation, and then they refer them to me when their efforts have failed.''

The physical education teacher who reported petitioner to the vice-principal was James Cady, who also testified. Cady said that five physical education teachers ''police more or less'' students for long hair. He (Cady) had noted the length of petitioner's hair, spoke to him about it, and sent him to the vice-principal before the suspension occurred.

The defense witnesses were interrogated concerning the meaning of the words ''extremes of hair styles.'' Mr. Fauria testified that he regarded ''extremes of hair styles'' as meaning ''deviation from acceptable wear,'' and that ''extremes'' meant ''deviations'' which were not acceptable to him. He considered that a bald-shaven head would be ''extreme'' on the one hand, the hair of a boy who had never visited a barber would be ''extreme'' on the other. Petitioner's hair, he said, was not within ''normal'' range: ''it was much longer than the range of students at Arcata High School.'' On the same subject, Cady testified that a boy's ''ears should be showing and . . . [if his hair is] down to the collar and starting to turn up or something like that, it is too long.''

The vice-principal also testified that ''extremes of hair styling'' could interfere with the ''learning situation'' at Arcata High School. He said that the type of haircut affected by petitioner is a ''focal point for conversation'' and ''discussion'' among students, and that ''long hair'' is an issue which interferes with classroom decorum.

Robert Meeks, another teacher at Arcata High School (but not a physical education instructor), testified that the ''length of hair style'' was a ''talked about item'' among the students, and that they discussed it in class to the point where it interfered with the conduct of a class by distracting the students from their classroom work. He testified that they also talked about other subjects (such as athletics, cars and girls), and that discipline in such matters was always a problem in a secondary school.

Little, if any, of the foregoing evidence associated petitioner's hair (as distinguished from long hair as a general topic) with classroom distractions at the school. However, Fauria and Cady both testified that, during the 1965-1966 (i.e., the preceding) school year, some of petitioner's fellow students (''vigilantes,'' as counsel for the school authorities put it) took exception to the length of his hair, seized him, gave him a forcible haircut, and slightly injured him in the process.

Cady testified that on October 18, 1966, petitioner's hair was "too long . . . beyond what we allowed." He asked petitioner how much time he needed to have it cut. Petitioner was not cooperative, whereupon Cady sent him to the vice-principal. The latter suspended petitioner after a further conversation produced no results. The vice-principal then wrote a letter to petitioner's mother, stating in pertinent part that "[Y]our son, Gregor, has been suspended from school for not abiding by the school policy regarding personal appearance. In the opinion of school personnel, your son was in violation of this policy."

So far as the trial record shows, Mr. Cady's standards of a male student hair style which was "too long" (because, as he put it, the hair obscures the student's ears, or reaches his collar, or "is starting to turn up") were not communicated to petitioner or to anyone else; an "acceptable" hair style, in terms of maximum permissible length or by reference to his ears or his collar or other criteria, was not defined to petitioner or to his mother by anyone; and neither of them was told how much of a haircut would produce a style which was "acceptable" as something other than "extreme." Two portrait photographs of petitioner each taken on the evening preceding his suspension, were received in evidence at the trial.[2]

Upon the foregoing evidence, the trial court found among other things that the school's "rule" that "'extremes of hair styles are not acceptable' is so vague and indefinite as to render said rule unconstitutional and unenforceable," and that the rule "was not properly enforceable against . . . [petitioner] due to its unconstitutionality." The court made substantially the same statements as "conclusions of law," and thereupon entered the order from which defendants appeal.

---

[2]According to the pictures, petitioner's hair (which is shown combed flat and parted) is not particularly bushy and does not cover any part of his ears. It does not quite reach his collar in the back, where it is closely trimmed.

The high school students who pursued similar relief against school authorities in *Ferrell* v. *Dallas Independent School Dist.* (5th Cir. 1968) 392 F.2d 697, affected " 'Beatle' type haircuts." The Circuit Court of Appeals depicted this neologism as follows (*id.*, p. 698, fn. 1):

"The hair styles of appellants are described in the following excerpt from the trial court's opinion:

" 'As described by the mother of Stephen Webb, . . . Stephen's hair is "over his ears, but one can see the lobe of his ear. It is not over his collar, but is over his forehead and down to his eyebrows." As described by the mother of Paul Jarvis, "his hair is about 1 inch over

Defendants first contend that the "dress policy" at Arcata High School, to the effect that "extremes of hair styles are not acceptable," is a reasonable exercise of the governing board's rulemaking power in the area of student discipline, and that it is not constitutionally unenforceable by reason of its language. Because of its language, however, we hold against both contentions; we affirm the order requiring petitioner's reinstatement.

■ The California Legislature has the constitutional duty and power to maintain a system of free public education in this state. (Cal. Const., art. IX, §§ 1, 5.) By statute, the Legislature has delegated to local school district governing boards the authority to operate the public schools within their respective political jurisdictions (Ed. Code, § 921[3]), and to promulgate necessary rules and regulations controlling student conduct. (*Id.*, § 10605.[4]) Students are required to comply with such regulations (*id.*, § 10609[5]) under pain of suspension. (*Id.*, § 10604 [quoted in fn. 4, *ante.*] See, generally, *Akin* v. *Riverside Unified School Dist. Board of Education, supra,* 262 Cal.App.2d 161, 167.)

---

his ears and about 1½ inches above his eyebrows." Phillip Ferrell's hair, if hanging straight forward, would come below his eyebrows, but is combed and turned to the side so as to be a very short distance above his eye brows. The hair extends down to the ear lobe on the side and to the collar in the back. This hair style adopted by these plaintiffs is in conformity with the so-called "Beatle" type hair style.' "

By these standards, petitioner is a Ferrell or a Jarvis in front (only), but neither Webb nor Beatle. From a view of the photographs, reasonable minds might agree that his hair is long. Whether it is worn in an "extreme" style is another matter.

[3]"921. Every school district shall be under the control of a board of school trustees or a board of education."

[4]Section 10604 provides in pertinent part that "The governing board of any school district may make and enforce all rules and regulations needful for the government and discipline of the schools under its charge. Any governing board shall enforce the provisions of this section by suspending, or, if necessary, expelling a pupil in any elementary or secondary school who refuses or neglects to obey any such rules and regulations."

(Education Code section 925 has been cited as the statutory source of a school district governing board's rulemaking power in the area of student discipline here involved. (*Akin* v. *Riverside Unified School Dist. Board of Education* (1968) 262 Cal.App.2d 161, 167 [68 Cal.Rptr. 557].) That section, however, is expressly limited to the promulgation of rules by a board "for its own government." Because the above-quoted language of section 10604 [although appended to a legislative prohibition of secret organizations in the schools] is not so limited, we conceive it to be the source of the board's authority to adopt rules controlling student dress and appearance.)

[5]"10609. All pupils shall comply with the regulations, pursue the required course of study, and submit to the authority of the teachers of the schools."

In some areas of student conduct involving dress and appearance, such regulations may clash with constitutional rights; and contemporary experience demonstrates this to be notably true of school regulations controlling male students' hair. (See, e.g., *Akin* v. *Riverside Unified School Dist. Board of Education, supra,* 262 Cal.App.2d 161; *Ferrell* v. *Dallas Independent School Dist., supra,* 392 F.2d 697; *Leonard* v. *School Committee of Attleboro* (1965) 349 Mass. 704 [212 N.E.2d 468, 14 A.L.R.3d 1192]; Comment, *The Power of School Officials to Regulate Student Appearance* (1966) 3 Harv. Legal Comm. 1; Annot., 14 A.L.R.3d 1201.)

▇ The wearing of a beard by one engaged in the educational process is an expression of his personality and, wearing it, he is entitled to the protection of the First Amendment of the Constitution of the United States. (*Finot* v. *Pasadena City Board of Education* (1967) 250 Cal.App.2d 189, 201-202 [58 Cal.Rptr. 520] [teacher]. See *Akin* v. *Riverside Unified School Dist. Board of Education, supra,* 262 Cal.App.2d 161 at p. 167 [high school student].) Because a long hair style is indistinguishable from a beard for constitutional purposes,[6] a male affecting it in a school is entitled to the same protection. ▇ Adulthood is not a prerequisite: the state and its educational agencies must heed the constitutional rights of all persons, including schoolboys. (*Board of Education* v. *Barnette, supra* (fn. 6, *ante*), 319 U.S. 624 at p. 637 [87 L.Ed. 1628 at p. 1637, 63 S.Ct. 1178, 147 A.L.R. 674]. See *In re Gaullt* (1967) 387 U.S. 1, 13 [18 L.Ed.2d 527, 538, 87 S.Ct. 1428]; *Akin* v. *Riverside Unified School Dist. Board of Education, supra,* at p. 167; *Robinson* v. *Sacramento City etc. School Dist.* (1966) 245 Cal.App.2d 278, 291 [53 Cal.Rptr. 781].)

[6]A California court has observed that men wear beards as symbols (symbols of masculinity, authority and wisdom, or of nonconformity and rebellion), and that it is the symbolic value which merits constitutional protection. (*Finot* v. *Pasadena City Board of Education, supra,* 250 Cal. App.2d 189 at p. 201.) The symbolic value of long hair on a male is probably less obvious: we do not readily accept it as symbolic of masculinity, for example, and in the modern secondary school it may bespeak conformity rather than otherwise. (For a discussion of its symbolism among school students, see Comment, *supra,* 3 Harv. Legal Comm. 1 at p. 2.) Its symbolic value, however, need not be judicially assessed: the symbolism is subjective in the person wearing it. "A person gets from a symbol the meaning he puts into it, and what is one man's comfort and inspiration is another's jest and scorn." (*Board of Education* v. *Barnette* (1943) 319 U.S. 624, 632-633 [87 L.Ed. 1628, 1634-1635, 63 S.Ct. 1178, 147 A.L.R. 674].) If a growth of hair means anything to its wearer (including his right to wear it long), the First Amendment protects him in affecting it, and this is so whether he displays it on his chin or on his scalp.

School authorities, nevertheless, may impose more stringent regulations upon the constitutional rights of minors than upon those of adults: ''where there is an invasion of protected freedoms '. . . the power of the state to control the conduct of children reaches beyond the scope of its authority over adults. . . .' (Citation.)'' (*Ginsberg* v. *New York* (1968) 390 U.S. 629, 638 [20 L.Ed.2d 195, 203, 88 S.Ct. 1274] (quoted, in a school-student context, in *Akin* v. *Riverside Unified School Dist. Board of Education, supra,* 262 Cal. App.2d 161 at p. 166.) █ It follows that not every limitation upon the exercise of secondary students' constitutional rights, by a school district governing board, is prohibited (*Akin* v. *Riverside School Dist. Board of Education, supra*); and, where there is empirical evidence that an aspect of a student's dress or appearance (such as a hair style) has a disruptive effect within a school, the board may prohibit it. (*Id.,* at pp. 168-169; *Ferrell* v. *Dallas Independent School Dist.,* 392 F.2d 697 at pp. 699, 702-703 (cert. den., 393 U.S. 856 [21 L.Ed.2d 125, 89 S.Ct. 98]); *Leonard* v. *School Committee of Attleboro, supra,* 212 N.E.2d 468 at p. 472. See *Finot* v. *Pasadena City Board of Education, supra,* 250 Cal.App.2d 189 at p. 202.) Accordingly, the governing board in the present case could validly exercise its statutory rulemaking power to require that petitioner wear his hair at a shorter length.

The board need not have enacted a formal regulation to achieve this result, but one materialized in the form of the ''dress policy'' which states that ''extremes of hair styles are not acceptable.'' Petitioner has not asserted, in the trial court or here, that he had the right to defy any rule or instruction directed to his hair: he challenged this one—the ''dress policy''—for its vagueness. (He also alleged that his hair complied with it.) In the pleadings, both parties alleged that he was suspended because his hair violated the ''policy''; the vice-principal so testified; and defendants have stood squarely upon the ''policy,'' both at trial and on the appeal. The propriety of the suspension therefore depends upon the validity of the ''policy.'' Both, in our view, were invalid.

█ Acting in this constitutional field, a school district governing board must act constitutionally. The exercise of its rulemaking power must meet the standards of reasonableness enunciated in *Bagley* v. *Washington Township Hospital Dist.* (1966) 65 Cal.2d 499, 501-502 [55 Cal.Rptr. 401, 421 P.2d 409]; the restraint imposed by its regulations must rationally

relate to the enhancement of the educational function, the public benefits produced must outweigh the consequent impairment of the student's constitutional rights, and there can be no alternatives "less subversive" of those rights. (*Akin* v. *Riverside Unified School Dist. Board of Education, supra,* 262 Cal.App.2d 161 at pp. 167-168.) In the present case there is substantial evidence that long hair, on male students, had a disruptive effect at Arcata High School. Because of the public's obvious interest in an undistracted educational process at the school, the "dress policy" (as it affected male students' hair) met the first two tests mentioned above.

As to the third *Bagley* test, the governing board's "policy"[7] fails. ■ As we have seen, its inhibition of hair styles restrains the freedom of expression guaranteed by the First and Fourteenth Amendments. In this area, the standards of permissible statutory vagueness are strict and government may regulate "only with narrow specificity." (*N.A.A.C.P.* v. *Button* (1963) 371 U.S. 415, 432 [9 L.Ed.2d 405, 417-418, 83 S.Ct. 328]. See *Fort* v. *Civil Service Com.* (1964) 61 Cal.2d 331, 337 [38 Cal.Rptr. 625, 392 P.2d 385].) In the *Finot* and *Akin* cases, the applicable regulations prohibited the wearing of beards at school. (*Finot* v. *Pasadena City Board of Education, supra,* 250 Cal.App.2d 189, at p. 191; *Akin* v. *Riverside Unified School Dist. Board of Education, supra,* 262 Cal.App.2d 161 at p. 163.) This was "narrow specificity," because a beard—and its presence or absence—is a fact.

■ "Extremes of hair styles," however, are not facts: whether a given style is "extreme" or not is a matter of opinion, and the definitive opinion here rested in the sole— and neither controlled nor guided—judgment of a single school official. To him, an "extreme" style was "deviation from acceptable wear," but it was he alone who decided what was "acceptable" in the first instance and what was "deviation" in the next. While his personal good faith in the matter is clear, the "policy" is "far from the kind of narrow

---

[7] As previously noted (fn. 1, *ante*), it is not clear from the evidence that the "policy" (or "regulation") in question was explicitly adopted by the governing board itself. A further question thus raised is whether the "policy" is in fact that of the board (which is authorized by the Legislature to make necessary rules affecting student conduct) or of another body (which is not). Because our comments presuppose that the "policy" is the board's, we do not reach this question. The uncertain origins of the "policy," however, may contribute to the vagueness we find in its language.

exception to freedom of expression which a state may carve out to satisfy the adverse demands of other interests of society,'' (*Joseph Burstyn, Inc.* v. *Wilson* (1952) 343 U.S. 495, 504 [96 L.Ed. 1098, 1107, 72 S.Ct. 777]), and it totally lacks the ''specificity'' required of governmental regulations which limit the exercise of constitutional rights.

    A ''law'' violates due process ''if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits or leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case. [Citations.]'' (*Giaccio* v. *Pennsylvania* (1966) 382 U.S. 399, 402-403 [15 L.Ed.2d 447, 450, 86 S.Ct. 518].)     The ''dress policy'' concerning hair styles in the present case is ''vague and standardless.'' It is not a ''law'' in the sense that criminal sanctions attend its violation, but a violation means suspension from school.

    The importance of an education to a child is substantial (see, e.g., *Brown* v. *Board of Education* (1954) 347 U.S. 483, 493 [98 L.Ed. 873, 880, 74 S.Ct. 686, 38 A.L.R.2d 1180]), and the state cannot condition its availability upon compliance with an unconstitutionally vague standard of conduct. (See *Bagley* v. *Washington Township Hospital Dist., supra,* 65 Cal.2d 499 at pp. 503-504.)

We recognize that school regulations not unlike the one here involved were upheld in each of the two principal cases which deal with male high school students who were suspended because of the length of their hair. (*Ferrell* v. *Dallas Independent School Dist., supra,* 392 F.2d 697; *Leonard* v. *School Committee of Attleboro, supra,* 212 N.E.2d 468.) The language of the *Ferrell* regulation appears in the trial court's opinion [261 F.Supp. 545], but not in the appellate decision; the *Leonard* decision mentions the applicable regulation only in passing (212 N.E.2d 468 at p. 470); and, apparently, none of the students affected (who were appellants in both cases) challenged the respective regulation upon the ground of vagueness. Therefore, we do not read either decision as constitutional authority for the enforceability of a ''policy'' which proscribes—but which does not define—''extremes of hair styles.''

Arguing against vagueness in the ''dress policy,'' defendants cite decisions which uphold the constitutionality of statutes restraining the emission of ''excessive smoke'' (*People* v. *Madearos* (1964) 230 Cal.App.2d 642 [41 Cal.Rptr. 269]) and of ''excessive or unusual noise'' (*Smith* v. *Peterson* (1955)

131 Cal.App.2d 241 [280 P.2d 522, 49 A.L.R.2d 1194]) from motor vehicles. But these cases rest upon the premises that the words "excessive smoke" and "excessive or unusual noise" convey ideas which find "adequate interpretation in common usage and understanding" (*Smith* v. *Peterson, supra,* at p. 246), and that whether an emission is "excessive" is a fact which is reasonably determinable from ordinary experience. (*Id.,* at pp. 249-250; *People* v. *Madearos, supra,* at pp. 644-645.) ▮▮▮ The same premises do not exist in the present case. The words "extremes of hair styles" convey no commonly understood meaning, and whether one such style at Arcata High School was "extreme" was neither determinable nor predictable by anyone except the vice-principal. The *Madearos* and *Smith* decisions, accordingly, do not lend constitutional stature to the "dress policy" allegedly violated by petitioner.

Since—as we have seen—the governing board has the statutory power to regulate aspects of student dress and appearance which have an adverse effect upon the educational process at the school, it may enact regulations which would be valid because less subversive of the students' constitutional rights.[8] (*Bagley* v. *Washington Township Hospital Dist., supra,* 65 Cal.2d 499 at pp. 501-502; *Akin* v. *Riverside Unified School Dist. Board of Education, supra,* 262 Cal.App.2d 161 at pp. 167-168.) It has not done so. Therefore, its "policy" prohibiting "extremes of hair styles" cannot be enforced by the suspension of noncomplying students, including petitioner. (*Bagley* v. *Washington Township Hospital Dist., supra,* at pp. 506-507.)

▮▮▮ The other principal point raised by defendants on the appeal is based upon these facts as shown by the evidence:

[8]Although this case does not permit us to determine what might be a valid regulation controlling the hair styles of male high school students, we note that a United States District Court has recently upheld a regulation which was adopted by a school district's principals under the authority of a rule enacted by the district board of education.

The board's rule read as follows: "Student grooming and attire. Students shall be groomed and attired in a manner appropriate to a decorous school environment. Principals are authorized to establish reasonable rules delineating acceptable standards for grooming and dress and to enforce such standards by actions necessary to effect conformance therewith."

The principals' regulation stated: "Whenever a boy's hair *falls below the eyebrows, covers all or part of the ear,* or is *so long in back that it hangs over his shirt collar,* school officials may feel free to adjudge the boy as being unacceptably groomed and may exercise discretionary judgment in requesting that the hair be trimmed to conform to an acceptable

.Petitioner did not reside in Arcata Union High School District. He lived in Eureka High School District, but had nevertheless attended Arcata High School throughout the 1965-1966 school year and had re-enrolled at, and attended. the school in September 1966. The two districts had entered into a written interdistrict attendance agreement, pursuant to Education Code section 10801,[9] covering the 1966-1967 year. The agreement provided that a student residing in either district could attend a school in the other if he had a ''proper permit'' from the district of his residence. This meant, in petitioner's case, that he was required to have such permit from the Eureka district in order to attend Arcata High School.

No such permit had been issued to petitioner at any time prior to his suspension from attendance at Arcata High School. This fact was discovered by the Arcata district authorities only after he had been suspended on October 19, 1966. The Eureka district issued a ''permit'' in the matter on October 20; the evidence does not show who applied for it. On October 31, the Arcata district superintendent advised the Eureka High School District, by letter, that the Arcata district could not accept petitioner as a student under the interdistrict attendance agreement ''because of his failure to comply with school regulations.''

From the foregoing evidence the trial court found that petitioner resided in Eureka High School District, but that—as pleaded in his petition—he had been ''a student regularly attending . . . Arcata High School''; that he ''did in fact enroll in and attend Arcata High School . . . and no objection to his attendance at Arcata High School was raised by . . . [defendants] until October 31, 1966''; and that the school, therefore, was ''by its own inaction estopped'' from

standard. If necessary, a boy may be suspended from school until his hair is trimmed in an acceptable fashion.''

(*Contreras* v. *Merced Union High School District* (E.D. Cal. 1968) No. F-245-CIV. The quoted language appears in the court's findings of fact and conclusions of law: as of the date hereof, no formal decision has been published. The italics appearing above have been added.)

[9]''10801. The governing board of any school district may admit to the schools or classes maintained in the district any pupil who lives in another school district which maintains schools or classes of the grade levels which the pupil desires to attend. An agreement providing for such attendance shall be entered into between the governing board and the governing board of the district in which the pupil lives. The agreement shall stipulate the terms upon which the interdistrict attendance shall be permitted. The terms of the agreement may require the payment of actual cost of education of the pupil, . . . or any lesser amount per pupil, as determined by the governing boards in their discretion, but in any event not less than the state apportionments resulting from the attendance.''

suspending him. By our interpretation of this language, the court found that defendants, having allowed petitioner to attend Arcata High School without a permit prior to his suspension, was estopped from suspending him upon the ground that he lacked one.

Defendants, so interpreting the language, challenge the sufficiency of the evidence to support an estoppel. However, it was shown (and it is not disputed) that a permit *was* issued by the school district of petitioner's residence on October 20, 1966. This meant that he was entitled to attend Arcata High School, so far as the interdistrict attendance agreement was concerned, because there had been compliance with the agreement. It follows that his alleged violation of the school's "dress policy" was the only ground for suspending him, and that the finding that defendants were "estopped" from suspending him on other grounds was—correct or not—unnecessary. Therefore, and because the trial court's finding on the constitutional point supports the judgment we need not examine the sufficiency of the evidence to support an estoppel. (See 3 Witkin, Cal. Procedure (1954) Appeal, § 103, par. [g], p. 2277.)

Since the interdistrict attendance agreement had been complied with on October 20, 1966, and since the "dress policy" was void (as we have held), defendants were without discretion to exclude petitioner under the suspension pronounced on October 19. Therefore, and contrary to defendants' final contention on the appeal, mandamus was the proper remedy. (Code Civ. Proc., § 1085; *Piper* v. *Big Pine School Dist.* (1924) 193 Cal. 664, 669 [226 P. 926].)

The order directing issuance of a writ of mandate is affirmed.

Devine, P. J., concurred.

CHRISTIAN, J.—I dissent.

Subject always to constitutional requirements, it is provided by statute in California that "The governing board of any school district may make and enforce all rules and regulations needful for the government and discipline of the schools under its charge." (Ed. Code, § 10604.) Neither this section nor any other provision of law *requires* that school discipline be maintainable only pursuant to formal written regulations; indeed, it is provided in Education Code section 10601 that a classroom teacher may "for good cause" sus-

pend a pupil from school "for not exceeding one schoolday, plus the remainder of the schoolday during which the suspension is ordered, . . ." Section 10602 provides that "Continued willful disobedience, [or] open and persistent defiance of the authority of the school personnel, . . . shall constitute good cause for suspension or expulsion from school; [if] the conduct for which [the student] is to be disciplined is related to school activity or school attendance." Neither of these sections requires the adoption of regulations by the governing board or by school administrators in order for valid disciplinary action to be taken thereunder. Both quoted passages are of quite early origin: the passage quoted from section 10601 has been part of the statutory law of this state since 1873.[1] The language quoted from section 10602 has had a place in the California statutes in substantially its present form since the enactment of the Political Code in 1873.[2] The reference in section 10604 to the power of the governing board to "make and enforce all rules and regulations needful for the government and discipline of the schools under its charge" is of more recent origin: it first appears as a subsidiary and implementing section of an enactment quaintly designated in the statute book as the "Anti-frat Act" (Cal.Stats. 1909, ch. 218, § 2). Neither the 1909 enactment nor any subsequent amendment suggests that the Legislature intended to require the educational authorities to adopt formal rules and regulations as a precondition to maintaining reasonable school discipline. Search reveals no reported decision of any American court, other than the majority opinion in the present case, holding or implying that the adoption of such regulations is a constitutional prerequisite to reasonable school discipline.

The majority opinion mentions that some school districts have adopted elaborate and almost scientifically discrete haircut regulations. That they are free to do, so long as the regulations are not arbitrary, capricious, or otherwise unconstitutional. But consider the almost infinite variety of disciplinary

[1]Political Code, section 1696, as amended by Cal. Stats. 1873, ch. 543, § 27, provided that "Every teacher in the public schools must: . . . 4. Hold pupils to strict account for disorderly conduct on the way to and from school, on the play-grounds, or during recess; suspend for good cause any pupil in the school, and report such suspension to the Board of Trustees or Education for review."

[2]Political Code, section 1685: "Continued willful disobedience or open defiance of the authority of the teacher constitutes good cause for expulsion from school; and habitual profanity and vulgarity good cause for suspension from school."

concerns which may arise in a public school: personal sanitation, dress, disorder in the passageways, disruptive speech or conduct in class, and use of bicycles or motor transport, to name a few. Must a school specify in a written regulation the minimum allowable frequency of baths before a teacher may require a student to be clean? What kind of specific regulation is required to enable teachers to restrain disruptive speech in classrooms or movement in passageways? All these matters may lawfully be left to adjustment and reasonable control by teachers acting informally. It would needlessly disable our schools to force the handling of such problems into a mold of rule and regulation. So long as the teacher acts reasonably the Constitution does not require him to work in an atmosphere of litigious contest with any juvenile sealawyer who may appear in his class.

Despite the fact that the governing board need not have adopted any written regulations whatever, in order to enable school personnel to exercise reasonably the broad powers vested in them by statute, the trial court found and concluded that respondent's suspension from school was unlawfully founded upon a vague, indefinite and unconstitutional rule that "extremes of hair styles are not acceptable." Respondent himself did not allege in his petition the existence of such a rule; he merely quoted, from a mimeographed student orientation pamphlet which is in evidence, the language which the court found objectionable. It is not clear how the trial court concluded that the inclusion in the pamphlet of this language, indicating generally that students would be required to maintain good grooming, restricted or abolished the power of the principal or his delegates to carry out such a policy on a case-by-case basis. There are certain references to "regulations" in the record; but those unnecessary references have no significance. Respondent was not suspended from school as a penalty for violating some "regulation" which should have been drawn with the specificity of a plumbing code or a penal statute; he was suspended upon his "continued willful disobedience," in the language of Education Code, section 10602, of the vice-principal's request that he get a haircut. No claim is made that the request was vague or unintelligible; had respondent desired to know how long he could leave his hair he could have asked for further discussion. Instead he flatly refused to get a haircut. A request to get a haircut or any other school requirement regarding dress, conduct, or expression may be subject to constitutional attack if it is arbitrary

or capricious or does not give due weight to First Amendment rights. (Cf. *Bagley* v. *Washington Township Hospital Dist.* (1966) 65 Cal.2d 499 [55 Cal.Rptr. 401, 421 P.2d 409].) But the opinion of the majority fairly sets out facts showing, as that opinion states, why it would have been lawful to "require that petitioner wear his hair at a shorter length"; that history needs no review here. (*Akin* v. *Riverside Unified School Dist. Board of Education* (1968) 262 Cal.App.2d 161 [68 Cal.Rptr. 557]; *Leonard* v. *School Committee of Attleboro* (1965) 349 Mass. 704 [212 N.E.2d 468, 14 A.L.R.3d 1192].)

Because the order of suspension was valid, a brief discussion of its consequences will be appropriate. Education Code, section 10607, provides that no secondary school student shall be suspended for "more than the duration of the current semester." A further limitation is imposed by section 10607.5: "no student shall be suspended . . . for more than 20 days . . ." unless he is transferred to a "continuation education school." Here the suspension was ordered on October 19. Because it was discovered in the course of the controversy that the boy resided in an adjoining high school district with which appellant district had an interdistrict attendance agreement, the district of residence was promptly notified that respondent was no longer acceptable at Arcata High School. The interdistrict agreement provides only for admission of students who are "acceptable to the district of attendance." When the boy had been suspended, and thus would soon require placement in continuation school, it was entirely reasonable for appellant district to terminate its tacit acceptance so that the district of residence could make its own determination whether under its policies there existed a disciplinary problem of such gravity as to require further suspension and placement in continuation school.

I would reverse the order for issuance of writ of mandate.

Appellants' petition for a hearing by the Supreme Court was denied April 9, 1969.