**Austin E. PRITCHARD, and Michael Pritchard, Petitioners,**

**v.**

**The SPRING BRANCH INDEPENDENT SCHOOL DISTRICT; the Board of Trustees of the Spring Branch Independent School District, Truitt Lively, President; David Mathias, 11th Grade Principal of Spring Woods Senior High School; Jack Ballard, Executive Director of Secondary Education; and Mary Jane Riddle, Tennis Coach, Respondents.**

**Civ. A. No. 69–H–1235.**

United States District Court
S. D. Texas,
Houston Division.

Jan. 22, 1970.

David H. Berg, Houston, Tex., for petitioners.

Knipp & Sedgeley, Ernest A. Knipp and James Kelly, Baker, Heard & Elledge, Dow H. Heard, Jr., Houston, Tex., for respondents.

MEMORANDUM AND OPINION:

HANNAY, District Judge.

### A.

This suit for federal injunctive relief purports to call into question the action

of Respondents as violative of the First, Third, Fourth, Fifth, Ninth, and Fourteenth Amendments to the Constitution of the United States and is urged pursuant to the authority conferred by Title 42, U.S.C.A. § 1983 and Title 28, U.S.C.A. § 2201.

## I.

The suit is brought by Austin E. Pritchard, the father and next friend of the co-suitor, Michael Pritchard, a minor. Petitioners are residents of Harris County, Texas. The Respondent, Independent School District and subordinate Co-Respondent institution and individuals are located or resident in Harris County, Texas, and are therefore likewise within the territorial and venue jurisdiction of this Court.

 The controversy arises out of disciplinary action taken against the Petitioner Michael Pritchard at the Spring Woods Senior High School where, prior to such action, he was a student in the 11th Grade. The Court has permitted an extensive, indeed exhaustive, evidentiary hearing upon the merits of the controversy. A pertinent preliminary question arises as to whether Petitioners have first properly exhausted their available administrative remedies. The adequate administrative machinery set up by Respondents for appeal and review in the area of student discipline, and the instances of judicially known adjustments and fair administrative solutions with respect thereto, do not support Petitioners' claim of exemption by reason of foredoomed futility. Controlling here is the principle that the Federal Civil Rights Act, Title 42, U.S.C.A., Section 1983 creates supplementary original federal jurisdiction independent of the prior remedial exhaustion requirement, Damico v. California, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647; McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622, and that instant case under the Civil Rights Act is under all the present and immediate circumstances not so insubstantial as to compel withholding of federal jurisdiction at this time without more. See: King v. Smith, 392 U.S. 309, at 312, 88 S.Ct. 2128, 20 L.Ed.2d 1118, footnote 4. This suit concerns discretionary state activity in an area of many possible variables rather than the constitutionality of a state statute *per se* or its particular application. Title 28, U.S.C.A. Section 2281. The Court will reach the merits in this case.

## II.

The disciplinary action taken against the student Michael Pritchard resulted from his failure and refusal to comply with regulations at the Spring Woods Memorial High School governing male hair grooming. Responsibility for the maintenance of suitable attire by students during school hours, which includes the grooming of hair, is placed upon the principal of each school building by the Respondent Board of Trustees. Notice of this is provided to the students and their parents through an individual Student Handbook issued at the beginning of the school year. The established and uniform practice of the Board of Trustees is to vest in each individual building principal the authority to promulgate and enforce standards for acceptable male hair grooming in school. The standard in effect at Spring Woods Senior High School forbade male hair styling and growth to fall below the level of the eyes forward the head and forbade it to fall below the level of the collar in the back of the head. Sideburns of more than hitherto conventional length have been countenanced. The disciplinary enforcement of these standards is within the authority of each principal. The demeanor of each individual student concerned is considered in administering disciplinary enforcement of these standards and in evaluating the degree of administrative insistence that must be brought to bear in each case.

Pursuant to Article VII, Section 1, of the Constitution of the State of Texas, Vernon's Ann.St., which empowers the state legislature " * * * to establish and make suitable provision for the support and maintenance of an efficient

system of public free schools", the Board of Trustees of the several Independent School Districts have hitherto derived their regulatory authority over their respective schools through Article 2780, Vernon's Ann.Texas Civil Statutes. This authority of the School Boards of Trustees is preserved in the amendatory Texas Education Code, V.A.T.S., effective September 1, 1969. The pertinent provisions of this statute are Section 23.25 and Section 23.26(b) and (d):

" § 23.25. Powers and Duties

The Board of trustees of an independent school district shall have the powers and duties described in this subchapter, in addition to any other powers and duties granted or imposed by this code or by law.

§ 23.26. In General

(b) The trustees shall have the exclusive power to manage and govern the public free schools of the district.

(d) The trustees may adopt such rules, regulations, and by-laws as they may deem proper."

### III.

The student Pritchard, as the record and testimony reveal, had a record in the previous school year of 1968–1969 at Spring Woods Senior High School on the question of excessive hair growth. In the present school year of 1969–1970, on December 8, 1969, the student Pritchard appeared before his 11th grade principal for a conference regarding his hair. He was given until the following Wednesday, December 10, 1969, to have his hair properly trimmed. This he failed or refused to do, and on the latter date he was sent home from school. (It is material that his readmission to school is contingent only upon his compliance with the grooming regulation in question). By this time his parents had made it known to the grade principal, or were soon to make it known to him, that they were not going to require their son to comply with the school directive. The elder Pritchard testified at the hearing. He contacted the grade principal to re-

quest reconsideration of the order. He contacted and sought advice from other officials within the school system on an individual basis. There is no proof that the matter was ever presented before a duly constituted reviewing panel of the school. By his own testimony the father decided to become adamant after conferring with the grade principal. His position was that the matter was one of parental prerogative and responsibility rather than school authority; that he would first have to be convinced that a school disciplinary problem existed or that school disruption was being caused; and that the word of the school authorities on this subject in this case was insufficient.

The student Pritchard testified at the hearing. He admitted full awareness of the regulations and that he was in knowing violation of these regulations at times material herein. He further testified that he knew of altercations and name calling episodes between exponents of long hair for males at the school and the students there who objected to it. The student Pritchard is a musician. He has in his spare time played in a band for some two years and earned a degree of remuneration for this work. He testified that his audiences are less appreciative of short hair. He did not testify that they in effect demand of him male hair grooming in excess of the school regulations. If so, it is not shown that this could not be accomplished by an artificial wig at appropriate times.

School officials brought forth by Respondents testified emphatically and with corroboration of a growing disciplinary and decorum problem in school relating to male student long hair. An incident of this has been a noticeable diminution in academic excellence. This fact is fairly reflected in the student Pritchard's academic performance at Spring Woods High School over the last two and one-half years—the latter half of which period is identified with the long hair problem. Academically, the record reveals Pritchard to be an acceptable but not a superior scholar. Over the

period in question his general grades have ranged from A to C, that is, from excellent progress to average progress. A closer look reveals that there has been a discernible trend downward in hard core subjects not related to music. For instance, in his ninth grade, the school year 1967–1968, his grade in algebra dropped from B to C. In the same year his grade in physical science fell the same. In the following year, 1968–1969, which includes both semesters, his only grade above C in a non-music related course was in English. In the first two periods of the first semester of the current academic year, 1969–1970, the case was the same except for American History; and his curriculum for the current year as shown by the record reveals no courses in math or science and three different courses that are music related. His conduct record has been somewhat erratic on the basis of the positive proof before the Court. The student Pritchard further testified that he has pressed his case substantially in reliance on what he deems to be his constitutional rights vis-a-vis the school authorities in light of recent cases and his understanding of them.

The record and the testimony of the Petitioners do not disclose that the student Pritchard was attempting to express any particular ideological, political, religious, or philosophical belief. At most, the expression is that the school officials do not have the authority to promulgate the regulations in question or that their interpretation and application of these regulations in this case is illegal. The father testified that he was opposed to long hair. This of course the son knew, and is plain proof that the son does not consider himself a fit subject for discipline either by a parent or the proper school authorities.

### B.

It is true that student activity in the form of peaceful and non-trespassory protest, self-expression, and demonstration has been recognized as being within the reach of the Freedom of Speech and/or of Assembly guarantees of the First Amendment to the Constitution of the United States as it is applicable to the states through the Fourteenth Amendment. This guarantee, in the sense of its availability for invocation in an appropriate case, has been extended to off-campus activity, Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697, Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471, as well as that activity which is in-school or on-campus. West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628. Compare, however, Adderley v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966), where the student Petitioners had conducted and defiantly continued their demonstrations of protest on a nonpublic county jail driveway and the United States Supreme Court declined to overturn on First Amendment grounds their resulting state convictions for trespassing. The authorities have recognized a form of expression which is symbolic in nature and sufficiently akin to speech *per se* to warrant First Amendment consideration. Brown v. Louisiana, 383 U.S. 131, at 141–142, 86 S.Ct. 719, 15 L.Ed.2d 637.

### IV.

In the recent case of Tinker v. Des Moines School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (February, 1969), the United States Supreme Court declared illegal the expulsion of several secondary level students for wearing black arm bands, and purporting to do so for a limited period of time, in protest against the conflict in Vietnam. In the facts and circumstances of that particular case the action of the school authorities was deemed violative of the students' First Amendment—Fourteenth Amendment rights. In *Tinker* the school authorities made no showing below, and the District Court made no such finding, that in the circumstances of the case " * * * the wearing of the arm-bands would substantially interfere with the work of the school or impinge upon

the rights of other students." 393 U.S., at 509, 89 S.Ct. at 738. The case was one in which only a few of some 18,000 students in the local school system wore the black arm bands. 393 U.S., at 508, S.Ct. 733; the few purported to wear arm bands for only a limited and specified period of time, to-wit, during the Christmas holiday period which coincided with a periodic Vietnam truce, 393 U.S., at 504, 89 S.Ct. 733; there was no proof that school or class work was disrupted, 393 U.S., at 508, 89 S.Ct. 733; " * * * there were no threats or acts of violence on school premises." 393 U.S., at 508, 89 S.Ct. at 737. The record in *Tinker* disclosed that the student demeanor prohibited there had minimal if any effect upon the normal learning and behavioral atmosphere of the school. In treating constitutional liberty of personal expression, the United States Supreme Court in *Tinker* stated with distinctive relevance to instant case:

> "The problem posed by the present case does not relate to regulation of the length of skirts or the type of clothing, to hair style, or deportment. Cf. Ferrell v. Dallas Independent School District, 5 Cir., 392 F.2d 697 (1968); * * *." 393 U.S., at 507–508, 89 S.Ct. at 737.

### V.

In Ferrell v. Dallas Independent School District, 5 Cir., 392 F.2d 697, certiorari denied, 393 U.S. 856, 89 S.Ct. 98, 21 L.Ed.2d 125, the Court of Appeals for the Fifth Circuit dealt squarely with the authority of local public school officials to promulgate and enforce regulations concerning acceptable masculine hair grooming in a particular school in light of asserted First Amendment— Fourteenth Amendment rights by certain allegedly aggrieved and disciplined students. The case on appeal arose from a denial of injunctive relief after a thorough and complete evidentiary hearing below on the merits of the case. It is clear that the standard applied by the Fifth Circuit is one of substantive and procedural due process under the Fourteenth Amendment. 392 F.2d at 702.

" * * * Constitutional issues which arise under the Bill of Rights have been before the courts many times. The decided cases clearly demonstrate that each case must be decided in its own particular setting and factual background and within the context of the entire record before the court in determining whether the rule or the action about which complaint is made is arbitrary, capricious, unreasonable or discriminatory. * * * Thornhill v. State of Alabama, 310 U.S. 88, 101, 60 S.Ct. 736, 84 L.Ed. 1093, 1102; West Virginia State Board of Education v. Barnette, 319 U.S. 624, 627, 63 S.Ct. 1178, 87 L.Ed. 1628, 1637; Dennis v. United States, 341 U.S. 494, 510, 71 S.Ct. 857, 868, 95 L.Ed. 1137, 1153; Whitney v. People of the State of California, 274 U.S. 357, 376, 47 S.Ct. 641, 71 L.Ed. 1095, 1106. * * *" 392 F.2d at 702.

In light of the whole record, which presented facts strikingly similar to those here, the Court of Appeals in Ferrell v. Dallas Independent School District, supra, affirmed the lower court's denial of injunctive relief. The standard of Fourteenth Amendment due process was again controlling by necessary implication in Davis v. Firment, 5 Cir., 408 F.2d 1085, affirming Davis v. Firment, D.C.E.D. La., 269 F.Supp. 524, where the Court of Appeals, Per Curiam, held that Ferrell v. Dallas Independent School District, supra, was dispositive of a factually similar case involving secondary public school regulation of masculine hair grooming. Compare: Zachry v. Brown, D.C.N.D. Alabama, 299 F.Supp. 1360 where the District Court granted injunctive relief on the basis of the facts presented in that case and expressly distinguished Ferrell v. Dallas Independent School District, supra, then pending on appeal. 299 F.Supp., at 1362. But see also: Stevenson et al. v. Wheeler County Board of Education, D.C. So.Dist. Ga., 306 F.Supp. 97 (November

17, 1969) ; Wood et al. v. Alamo Heights Independent School District et al., D.C. W.Dist. Texas, 308 F.Supp. 551 (January 9, 1970), where the secondary school regulations governing male hair grooming were sustained on the basis of the records in the cases and the standard set out in Ferrell v. Dallas Independent School District, supra. In Burnside v. Byars, 5 Cir., 363 F.2d 744 (July 21, 1966) and Blackwell v. Issaquena County Board of Education, 5 Cir., 363 F.2d 749, the same panel of the Court of Appeals for the Fifth Circuit reached opposite results on the basis of the decidedly different factual records presented by the respective cases. Both cases involved symbolic speech, to wit, the wearing of buttons emblematic of emotion-charged beliefs in certain social and political fields. The Court of Appeals in these cases sets out the substantive standard by which the facts of record are to be judged and the issue determined, 363 F.2d at 754; but it does not in any way state that the primary burden of proof is on other than the petitioning parties or that there is a primary burden of justification on the part of the duly constituted state school authorities in the exercise of discretion vested in them by state law. 363 F.2d, at 748.

### VI.

The foregoing commentary upon the primary burden of proof on the constitutional issue in these cases is deemed relevant here in light of the recent case of Breen v. Kahl, D.C.W.D. Wis, 296 F.Supp. 702, affirmed in Breen v. Kahl, 7 Cir., 419 F.2d 1034 (December 3, 1969) and the rationale of which appears to have received acceptance in Griffin v. Tatum, D.C.M.D. Alabama, 300 F.Supp. 60, at 62.

The District Court in Wisconsin approached the male student long hair problem from the standpoint that the federal constitutional rights of the students required the state school authorities in the first instance to satisfy a "substantial burden of justification" for

their regulations, 296 F.Supp., at 706 and 708–709, citing and relying heavily on Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510, and arguing in favor of a broader equation between adult and minority rights and powers, citing In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (May 15, 1967), the recent landmark case on a minor's right to federally enforceable due process *during the adjudicatory stage of a juvenile delinquency proceeding that resulted, or could result, in commitment to a state institution.* 387 U.S., at 13–14, 87 S.Ct. 1428. (Emphasis added throughout.)

Griswold v. Connecticut, supra, involved a state statute proper rather than, as here, the discretionary action of an administrative body acting pursuant to state law. The state statute in *Griswold* forbade generally under sanctions of criminal punishment the use of contraceptives; and the accessory statute of that state was invoked to render persons, including a physician, counseling the use of contraceptives within the marital union criminally liable.

### VII.

The decision in *Griswold* deserves careful attention here for reasons to be more fully shown later. The Opinion of the Court first authoritatively rejects the suggestion that the Supreme Court of the United States could or should act as a supervisory legislative body concerning legitimate areas of state action and sovereignty. 381 U.S., at 482, 85 S.Ct. 1678. The Opinion of the Court then turns to two separate but related considerations upon which the decision is based. The first is that the First Amendment must be read in light of its spirit as well as its letter; and that such a reading is not merely supported but required by a host of definitive case pronouncements on the subject lest which the amendment in its meaningfulness could be seriously if not fatally impaired. 381 U.S., at 482–483, 85 S.Ct. 1678. "In other words, the First Amendment has a penumbra where *privacy* is pro-

tected from governmental intrusion." 381 U.S., at 483, 85 S.Ct. at 1681. Secondly, the Opinion of the Court turned to other of the Constitutional Amendments which are the federal Bill of Rights and which, on the basis of authoritative interpretation, demonstrate an area of personal immunity from governmental intrusion. 381 U.S., at 484–485, 85 S.Ct. 1678. In addition to the First Amendment, these include the Third Amendment which forbids the quartering of soldiers "in any house" in time of peace without the owner's consent; the Fourth Amendment which assures "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."; and the Fifth Amendment which creates an immunity or privacy against compulsory self-incrimination. In developing its cogent theory of a certain right of individual privacy implicit in the First Amendment and in the Bill of Rights, the Opinion of the Court, without citation of case authority, refers to the express language of the Ninth Amendment which reads, to wit:

"The enumeration in the *Constitution,* of certain rights, shall not be construed to deny or disparage others retained by the people."

Only two Justices dissented in *Griswold,* 381 U.S., at 507–531, 85 S.Ct. 1678. The concurring opinion in *Griswold,* 381 U.S., at 486–499, 85 S.Ct. 1678, wherein it clearly purports to break new ground concerning the scope and nature of the Ninth Amendment, is not necessary to the decision in *Griswold* and, considering the four separate opinions written by the majority of the Court in *Griswold,* 381 U.S., at 480–486, at 486–499, at 499–502, and 502–507, 85 S.Ct. 1678, it cannot necessarily be deemed an imperative portion of the decision.

The foregoing discussion is relevant here because this Court in this case must also carefully treat the question of constitutionally permissible state action.

## VIII.

The Ninth Amendment, along with the Tenth Amendment and mostly in *pari materia* with it, has traditionally been construed to pertain to the proper allocation of government power between the federal and state sovereigns. United Public Workers v. Mitchell, 330 U.S. 75, 94–95, 67 S.Ct. 556, 91 L.Ed. 754; Tennessee Electric Power Co. v. TVA, 306 U.S. 118, 143–144, 59 S.Ct. 366, 83 L.Ed. 543; Ashwander v. TVA, 297 U.S. 288, 330–331, 56 S.Ct. 466, 80 L.Ed. 688; see also: United States v. Darby, 312 U.S. 100, at 124, 61 S.Ct. 451, 85 L.Ed. 609. To date it has been fundamental American history, as yet undisturbed by necessary or compelling judicial invention, that the Ninth and Tenth Amendments were enacted to reserve to the several states and their respective citizenry those powers and rights not expressly delegated to the central government. It would be the opposite of this to ascribe to the stately 18th century rhetoric of the Ninth Amendment an intent to enlarge at the expense of the several states the federal judicial power created by Article III of the federal Constitution—a judicial power amply extended by the Fourteenth Amendment and its authoritative interpretation across the years.

## IX.

The judicial development of the First Amendment as applicable to the states through the Fourteenth Amendment has witnessed a discernible abhorrence for state level enactments which on their face trench upon fundamental and basic liberties. This area and era were fairly opened by Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931) (Opinion of the Court by Mr. Chief Justice Hughes). Into this area there arose for a while against restrictive state statutes the "clear and present danger" test first expounded by Mr. Justice Holmes in the World War I federal espionage case of Schenck v. United

States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919). Bridges v. California, 314 U.S. 252, at 262–263, 62 S.Ct. 190, 86 L.Ed. 192 (1944); West Virginia Board of Education v. Barnette, supra, at 639, 63 S.Ct. 1178 (1942); Cantwell v. Connecticut, 310 U.S. 296, 308, 60 S.Ct. 900, 84 L.Ed. 1213. Termimiello v. Chicago, 337 U.S. 1, at 4–5, 69 S.Ct. 894, 93 L.Ed. 1131. An even more protected status for First Amendment—Fourteenth Amendment personal expression was advanced in Thomas v. Collins, 323 U.S. 516, at 529–530, 65 S.Ct. 315, 89 L.Ed. 430, with the expounding there of a "preferred place" doctrine for such guarantees; with this, of course, there would follow a more emphasized burden of justification on the part of the restricting state. This trend towards affirmatively shackling the states with a primary burden of justification in this area appeared later to be arrested and abandoned by the United States Supreme Court. The late Mr. Justice Frankfurter, in his concurring opinion in Kovacs v. Cooper, 336 U.S. 77, at 88, 69 S.Ct. 448, 93 L.Ed. 513, explored the then recent case authorities which increasingly reflected sensitivity to First Amendment claims and were applying them to the states through the Fourteenth Amendment. Mr. Justice Frankfurter concluded that:

> "In short, the claim that any legislation is presumptively unconstitutional which touches the field of the First Amendment and the Fourteenth Amendment, insofar as the latter's concept of 'liberty' contains what is specifically protected by the First, has never commended itself to a majority of this Court." 336 U.S., at 94–95, 69 S.Ct. at 457–458, 93 L.Ed., at 526.

Subsequently, the majority of the United States Supreme Court viewed this issue from the standpoint of sensitive due process reasonableness with the necessary implication that the state statute or action was presumably valid unless demonstrated to be otherwise by the record in each case. Feiner v. New York, 340 U.S. 315, 71 S.Ct. 303, 95 L.Ed.

267; Niemotko v. Maryland, 340 U.S. 268, 71 S.Ct. 325, 328, 95 L.Ed. 267; also: Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137.

## X.

A material question may therefore arise as to whether there can be a preliminary burden of justification on the part of the restricting state as urged in Breen v. Kahl, supra, with the necessary consequence that the customary presumption of statutory validity does not exist in this type of case but, on the contrary, is turned against the action of the sovereign state. As indicated heretofore, this is clearly not this Court's reading of the recent Griswold decision. (1965). The separate concurring opinions wherein it is mentioned by a minority of the whole Court might well be limited arguendo, in whole or in part, to distinguishable statutes which are on their face flagrantly repugnant to First Amendment rights. See, for example: NAACP v. Alabama, 377 U.S. 288, 84 S.Ct. 1302, 12 L.Ed.2d 325; NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405; McLaughlin v. Florida, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222; NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488; Bates v. Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480, wherein the state restrictions were tinged with racial discrimination and Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965, wherein the restriction had the direct effect of discriminating against a particular religious belief.

## C.

But however the burden of proof or the required degree thereof is viewed, the facts and circumstances in instant case are compelling. The testimony brought forth by the Respondents included but was not limited to that of the student Pritchard's grade principal, the principal of a senior high school in the district, and the Superintendent of the Spring Branch Independent School District.

## XI.

Their testimony reveals a definite and deepening disciplinary problem in the school relating directly to long hair. Those who are grooming their hair in this fashion at Spring Woods High School constitute a small minority—not more than 10% of the male student body. The disruption, distraction, and dissension being caused or precipitated by this phenomenon is far out of proportion to the numbers who are exponents of the practice. There is direct and corroborated testimony of student altercations, fist fights, severe and provocative verbal recriminations, personal harassment and group physical abuses directly relating to this novelty in male personal appearance. These disruptive episodes have occurred in the school environment alike in individual instances and in group activity that is curriculum-related or school-sponsored.

There is persuasive and uncontradicted testimony by the superintendent that the administration of secondary schools in general has in recent years been forced to turn its main attention to the growing disciplinary problem in the schools. This is not discipline for the sake of discipline or discipline as an end in itself. It is that reasonable and necessary degree of order and tranquility within the general school atmosphere without which learning by study cannot be won and the practice of good citizenship can seem to the young a self-defeating virtue.

There is persuasive and uncontradicted testimony that some 70% of the individual disciplinary problems in school are in fact exponents or practitioners of lengthy hair grooming for males. Likewise that the growing administrative preoccupation with peace and order in school has detracted from that consideration that must be accorded to the preservation and advancement of academic excellence; and that there has been in fact in recent years, coinciding with the deepening of the disciplinary problem, a general diminution in academic excellence in both the individual and in the group

sense. In consequence, the reputation of the institution is damaged; alarm and provocation are felt by conscientious and conventional students; demoralization sets in upon the responsible faculty. Such is the nature and import of the preponderant and prevailing testimony offered to this Court in this case and received by it.

## XII.

The Court is not persuaded that the regulations in question, in the constitutional sense, lacked for either specificity, uniformity, or fairness. The regulation of the length of male hair grooming, deemed necessary by the duly constituted school authorities, could not in practicality be a matter of overly exact measurement. This might easily invite excessive factual controversies as to precise compliance. Some discretion needed to be lodged in the school authorities in order to achieve a fair, flexible and effective administration of the standards; and all of this was both rationally and wisely related to the demeanor of each individual student involved.

The record demonstrates that the complained of action by the Respondents was not "arbitrary, capricious, unreasonable or discriminatory". Ferrell v. Dallas Independent School District, supra. On the contrary, it was action clearly calculated and necessary to protect the whole of the school environment. The record reveals that the regulation was reasonable and non-discriminatory as applied in instant case. It is reasonable and non-discriminatory *per se* and as applied generally.

The limited province of this Court is to determine if any federal constitutional right of the Petitioners has been violated in this case. The record is clear that none have been.

Further, recognizing the primary responsibility of the State of Texas to provide an efficient public school system, the record discloses that the actions of the Respondents herein were justified by substantial, compelling,

paramount, and subordinating governmental interests. See and compare: United States v. O'Brien, 391 U.S. 367, at 376–377, 88 S.Ct. 1673, 20 L.Ed.2d 672.

▆ I additionally find from the record that the federal constitutional issues urged by Petitioners here are not so substantial as to warrant the convening of a Three Judge District Court to consider injunctive relief. Jackson v. Choate, 5 Cir., 404 F.2d 910, 912; and King v. Smith, 392 U.S. 309, at 312, 88 S.Ct. 2128, 20 L.Ed.2d 1118, footnote 4 and the condition precedent stated there for compelling immediate federal jurisdiction in a purported civil rights action under Section 1983, U.S.C.A., Title 42.

Accordingly, the Petition for Injunction is in all respects denied.

The foregoing shall constitute Findings of Fact and Conclusions of Law. This is and constitutes a final judgment herein.