Lawrence Elliott DAWSON, Jr., and James B. Dawson, minors, by their father and next friend, Lawrence E. Dawson, Plaintiffs,

v.

HILLSBOROUGH COUNTY, FLORIDA SCHOOL BOARD, Defendant.

Civ. No. 70–570.

United States District Court,
M. D. Florida,
Tampa Division.

Jan. 22, 1971.

Supplemental Findings and Conclusions
Feb. 4, 1971.

David A. Maney, Tampa, Fla., for plaintiffs.

W. Crosby Few, David C. G. Kerr, and William Terrell Hodges, Macfarlane-Ferguson-Allison & Kelly, Tampa, Fla., for defendants.

## ORDER GRANTING PRELIMINARY INJUNCTION

KRENTZMAN, District Judge.

This came before the Court upon plaintiffs' application for a preliminary injunction. A hearing on the application was held on January 21, 1971, and the Court has considered the testimony, the exhibits, and the pleadings filed in this case. In view thereof, the Court now makes its Findings of Fact and Conclusions of Law and renders this, its Preliminary Injunction. Supplemental Findings of Fact and Conclusions of Law will be filed after a transcript of the hearing of January 21, 1971, has been prepared.

### FINDINGS OF FACT

1. This is an action in which injunctive relief is sought terminating minor plaintiffs' suspensions from Plant High School, Tampa, Hillsborough County, Florida.

2. In November, 1970 minor plaintiffs herein were suspended from Plant High School solely because their hair was not worn in conformity with the 1970–1971 Hillsborough County School Dress Code. In particular, minor plaintiff Lawrence E. Dawson, Jr., was suspended because (a) his ears were not entirely exposed, and (b) the back of his hair was too long, i. e., the back of the neck could not be seen. Minor plaintiff James B. Dawson was suspended because his ears were not entirely visible.

3. The 1970–1971 Hillsborough County School Dress Code was adopted by defendant school board and is enforced by school authorities acting in the name of the board. Plant High School is a public school operated under the authority of the school board.

4. Following their suspensions plaintiffs exhausted all state administrative remedies. The minor plaintiffs have not attended Plant High School since their suspensions, but have attended school in Volusia County, Florida.

5. Defendant school board has failed to show that the hair regulations in the Code are necessary to alleviate interference with the educational process. Specifically, the board failed to show that long hair has caused disruption in school (with the exception of incidents arising out of efforts to enforce the hair restrictions herein challenged), that long hair constitutes any danger to the health and safety of the school community, or that there is any compelling interest which school authorities have in concerning themselves with the length of their pupils' hair.

### CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and of the subject matter. 28 U.S.C. § 1343; 42 U.S.C. § 1983.

2. Defendant school board is responsible for the operation, control, and supervision of public schools in Hillsborough County, including Plant High School. Cf. Fla.Const. Art. 9, § 4(b) (1968) F.S.A.

3. The right to wear one's hair at any length or in any desired manner is an ingredient of personal freedom protected by the United States Constitution. Ferrell v. Dallas Independent School District, 392 F.2d 697 (5 Cir. 1968) (by implication); Breen v. Kahl, 419 F.2d 1034 (7 Cir. 1969).

4. Defendant school board has failed to show that the hair regulations contained in the 1970–1971 Code are necessary to alleviate interference with the educational process.

5. In suspending minor plaintiffs from Plant High School for violation of the Code, defendant school board has acted under color of state law to unlawfully deprive minor plaintiffs of a fundamental constitutional right.

6. The suspensions of minor plaintiffs have caused and are causing them irreparable harm for which there is not adequate remedy at law. Cf. Breen v. Kahl, 296 F.Supp. 702 (W.D.Wis.1969).

## PRELIMINARY INJUNCTION

Therefore, it is

Ordered and adjudged:

1. Defendant School Board of Hillsborough County, its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with it who receive actual notice of this order by personal service or otherwise, are hereby preliminarily enjoined as follows:

(a) Defendant School Board is hereby restrained from suspending or continuing to suspend minor plaintiffs from Plant High School solely because of their hair length or because of violations of the hair provisions of the 1970–1971 Hillsborough County School Dress Code, and defendant School Board is directed to readmit minor plaintiffs to Plant High School as of January 25, 1971.

(b) Defendant School Board is hereby directed to take all appropriate steps which will permit minor plaintiffs to make up for all academic loss or impairment each suffered by reason of defendant's unconstitutional suspension of said minor plaintiffs.

2. No bond shall be required to secure this preliminary injunction.

3. This order shall remain in effect until modified by further order of this Court.

4. Jurisdiction is retained.

## SUPPLEMENTAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

### FINDINGS OF FACT

#### I. THE HEARING

*Plaintiffs' Case*

##### Witness Ronald L. Allen

Plaintiffs called as their first witness an adverse witness, Ronald L. Allen, Dean of Boys at Plant High School since March 11, 1968. Dean Allen related the factual background leading to the suspensions of minor plaintiffs in November, 1970.

### A. Lawrence E. Dawson, Jr.

Dean Allen first spoke to Larry in late September, 1970, after Larry had been reported by faculty members to be in violation of the hair provisions of the 1970–1971 Hillsborough County School Dress Code (hereinafter Code).[1] Report of Proceedings at Hearing Upon Application for Preliminary Injunction (hereinafter R.), 8–9. Dean Allen advised Larry that he was in violation of the Code in two respects: his ears were not entirely exposed and the back of his hair was too long. In no other respect was he in violation of the Code. R., 11. Larry was told by Dean Allen to have his hair trimmed by the next morning or he would be asked to leave school.

Dean Allen next saw Larry in early November, again based on information received from faculty members. Dean Allen advised Larry that the school had "gone long enough" and "had to have his cooperation with the hair." R., 13. When Larry appeared at school the next day without complying with the Dean's directive, he was suspended.

Q. Did you see him the next morning?

A. Yes, sir.

Q. Had he had his hair cut by that time?

A. No, sir.

Q. Did you at that time suspend him?

A. Yes, sir.

Q. Was the reason for that suspension his failure to comply with the Grooming Code as set forth in the document you have before you?

A. It was, sir.

[1]. The Code provides, in pertinent part: "A. Boys—Attire and Grooming: 1. Hair cuts acceptable for school will be as follows: sideburns neatly trimmed—no longer than the lobe of the ear; back of the neck must be seen and the hair must be short enough on the forehead for the eyebrows to be seen. Ears must be entirely exposed."

Q. Was there any other reason for his suspension?

A. No, sir. R., 13–14.

### B. James B. Dawson

Dean Allen first spoke with James in early November. The meeting was in the Dean's office. Dean Allen advised James that his hair did not conform to the Code for the sole reason that the ears were not visible. R., 15.

Dean Allen told James to trim his hair over the evening and to report back the next day. When James did not report, he was summoned out of his class and suspended for the sole reason that his hair style violated the Code. Dean Allen concluded his testimony by stating that there is no school board regulation which regulates the length of girls' hair. R., 15–16.

#### Witness Lawrence E. Dawson, Sr.

##### Direct Examination

The father of the minor plaintiffs testified that his sons commenced the 1970–1971 school year at Plant High School but were not in current attendance because they had been suspended on account of their hair styles. Mr. Dawson testified that he was contacted by Dean Allen twice concerning the length of Larry's hair. R., 20. Mr. Dawson stated that to his knowledge his sons had never been in any trouble, disciplinary or otherwise, at Plant High School. R., 21.

##### Cross Examination

On cross examination, Mr. Dawson stated that he had received a copy of the Plant High School Handbook—containing the Code on pages 44–45—at the beginning of the 1970–1971 school year. Mr. Dawson had signed a tear-out card attached to the handbook and returned it to the school. On the card he expressed his opposition to the Code's hair regulations.

#### Witness Dr. Raymond O. Shelton

Plaintiffs then summoned to the stand the Superintendent of Schools of Hillsborough County, Dr. Raymond O. Shelton, as an adverse witness. Dr. Shelton testified that the Code had been adopted by defendant school board and reflects board policy. R., 29.[2]

##### Defendant's Case

#### Witness Dr. Raymond O. Shelton

##### Direct Examination

Dr. Shelton first explained his educational background—a bachelor's degree in 1948; a master's in 1956; and a doctorate in 1964. After a career in the educational field, he became Superintendent of Schools in Hillsborough County in July 1967.

Dr. Shelton testified at length concerning the origins of the Code. The school board already had a grooming policy in effect when he came to Tampa. The procedure behind the adoption of the current Code was this. Attempts were made to ascertain community norms; information was received from various groups, persons, and other school systems. This information was compiled in meetings of councils—the Senior High Schools Principals' Council and the Junior High Schools Principals' Council. The councils attempted to reach a consensus and submitted their recommendation to Dr. Shelton's administrative staff, which received them and passed them on to the school board, which adopted them and made them board policy. R., 49–52.

Dr. Shelton stated that in determining dress and grooming policies there is an effort made to restrain only those who deviate excessively from community norms.

> "We attempt to ascertain what the opinion would be at the community norm, for example; then we set a liberal relationship to that so that we would restrain only an extreme violator or deviant from—what we would ascertain to be a community norm.

2. At this point, plaintiffs rested. Defendant moved to dismiss, and after hearing argument, the Court denied the motion.

We are not discussing long skirts or short skirts or long hair; we are talking about an extremely long, extremely deviant type of behavior, in our opinion, after this examination." R., 52.

According to Dr. Shelton, board policy has changed as community norms change. The 1969–1970 Code, for example, contained regulations pertaining to footwear, socks, the tapering of boys' hair, mini-skirts, and girls' hairdos which were dropped from the 1970–1971 Code. R., 52, 53–57. It was his further testimony that periodic reviews of the county grooming policy would be continued. R., 59. He also said that the current Code is uniformly enforced. R., 63.

Dr. Shelton next testified that there were two reasons for the elaborate procedures whereby the school board adopted the Code. First, lines of communication were established between pupils, parents, teachers, and the school officials. Second, the procedures resulted in a code in accord with community norms. R., 63–64.

After stating that his last classroom experience was in 1958 (although he has kept in close touch with classrooms since then), Dr. Shelton proceeded to explain why he believes that a dress code is necessary in a school system. The reason, he said, relates to the purpose of education. Learning and the learning process is fostered by "a businesslike, pleasant, non-distractive atmosphere." R., 70–71.

"I think if you have extremes of any kind that appear, they must be prohibited or limited; and it is my experience that extremes of appearance and bizarre appearance are harmful to the efficiency of the learning process, of the instructional program; and the progress of all pupils and the individual pupils that it affects.

\* \* \* \* \* \*

And I think when you have distractive influences—be it behavior or verbal, or otherwise—it is very harmful to the instructional process.

\* \* \* \* \* \*

The appearance of youngsters—an extreme appearance or deviant appearance from an accepted norm, to me, is distractive." R., 71, 72.

Dr. Shelton was distressed not only by extremes of appearance but also with the attitude he feels it often represents.

"I don't think confusion at all is compatible with the accepted aims of education. And I think that any appearance of hair, for example, that is extreme—or where a youngster deliberately wears hair in an attempt to deliberately attract attention to himself, does so at the distraction of the entire class and becomes a harm to the situation." R., 72–73.

It has been Dr. Shelton's experience "that there is a direct relationship between appearance, an extreme deviant appearance, and conduct, and behavior." R., 73. He also believes that such persons tend to underachieve—that is, do not perform in proportion to their abilities. He thought there were studies in support of this position but was unable to name any. R., 73.

Dr. Shelton elaborated on his concern for the attitude he believes is represented by deviant appearance; he testified that youngsters who are extreme in appearance tend to go together as a class —they form into separate groups and create division within the school. R., 74. He continued by asserting that such persons "are not socially adjusted to the school situation." R., 74.

Next Dr. Shelton emphasized that grooming codes are a way in which the school system teaches pupils that there are norms in the world and that those who fail to adhere to those norms suffer certain consequences.

"I think this is important, too. Young people need to know that there are standards and values in society.

There are commonly accepted norms. And we have the job of preparing our people for vocations. And that there are consequences that if you deviate in appearance from the norm when you apply for jobs and so on; and

they need to learn that in school. And the way to learn that is by having standards, rules and regulations regarding dress and grooming in the schools.

That is one of the reasons for that, for example." R., 75.

Finally, Dr. Shelton expanded on his opinion that dress and conduct are related:

"I think they have a very direct effect, a very detrimental effect if there are extremes, gross extremes, deviant extremes from what would be an accepted norm; both upon the total school situation and on the individual himself—extremes." R., 77.

*Cross Examination*

On cross, Dr. Shelton was questioned concerning his view of the purposes of education; he replied in part:

* * * "I would say one of the basic purposes of education, of course, is moving the young people through various stages of development and training and so on to take their places as productive members of adult society. That is a basic purpose.

\* \* \* \* \* \*

A part of that, of course, is understanding that there are values in society and that there are standards and that we have institutions and that we have agreed that we will have them.

And that there is a norm; in other words, that when you move away from it you can be ostracized and that there are consequences of such a deviation. And it is best to learn this in a protected atmosphere—i. e., a public school—rather than be dumped on a cruel, cold world—excuse that—without any knowledge that there might be rules and regulations of some kind.

Q. Does this opinion that you state form the underpinning for the adoption of a Dress Code? That is, to prevent the student from facing the consequences of dissent later?

A. That is one part of it, I think. I stated many other things could be involved." R., 80–81.

Dr. Shelton was then asked on what facts he based his view that bizarre appearance causes distraction in the classroom.

"On the fact that classroom control, I think is very necessary; and that a youngster who is bizarre in appearance, who is extreme in appearance, coming into a class and going out of a class creates a distraction and a disruption which is harmful to the decorum, the control.

In many cases shows a hostility to the accepted norm; hostility to the teacher; and detracts from the authority of the teacher to handle the classroom." R., 83–84.

Dr. Shelton was then asked to recite any instances where bizarre appearance had created a disruptive atmosphere in a Hillsborough County classroom. He replied that since the Code was enforced, there could be no bizarre appearances and therefore no disruption caused by bizarre appearances. He added that to his knowledge there had been no disruption caused by bizarre appearances in the last four years. R., 84–85.

Dr. Shelton was asked if he knew of any systematized or formal studies showing that students deviant in appearance underachieve.

"I could not quote one, no, by name. There have been some. I would have to research the education research."

Q. I am correct in assuming that your opinion is founded on your own personal experience and your own personal information gained from Principals and Deans in this and other counties?

A. Yes, a great deal of it. R., 87.

Dr. Shelton then remembered an instance where disruption had been caused by the existence of a bizarre hairstyle. He recalled specifically an incident at Chamberlain High School involving boys who wore wigs.

"Chamberlain High School, if I can go back to the records, I can find several there.

I could refer to some individuals who were in and out of school; in an attempt to wear wigs to school and take off wigs and create distraction and disruption. I can refer to these cases by name specifically. The youngsters finally dropped out of school."

THE COURT: Well, now, were those distractions in connection with the enforcement of this rule or were they distractions among the students?

THE WITNESS: This is a distraction to a classroom decorum. The boy, because of his hair, creating an uproar and having fun, getting laughing, and creating a distraction and confusion, relating to his hair.

At Chamberlain High School specifically I can give you names and examples.

Q. When did this occur?

A. I think this was last year.

Q. And was this the wearing of a wig or wearing hair long?

A. It was long hair; and he would wear a wig one day and long hair another day; just to call attention to himself and create distraction. He would take off the wig in class. It would be long one time and wearing a wig another time. R., 88–89.

Dr. Shelton knew of no other disruptive incidents in the Hillsborough County System relating to hair, except those growing out of attempts to enforce the Code. R., 90. He then expanded upon his view that youngsters who move to extremes tend to be clannish, tend to create divisions, and are not socially adjusted.

"The tendency is certainly not for them to be accepted in the total school situation; at the expense of school morale, school spirit. And I think that their social adjustment is inhibited by not being associated freely and so on, with young people." R., 91.

Dr. Shelton then tried to connect this view with another position of his—that in school children should be taught that there are norms so that when they get into the world they will be able to cope with them.

"I don't know that it is related to my belief. I think that one of the reasons that a Board, any Board, would draw up rules and regulations would be relative—could be relative to this business of establishing norms, and for young people to learn that there are norms, so that they may adjust to them in a protected environment as compared to an environment where the consequences could be disastrous. In a school you have a chance to work with them hopefully and try to get them to come around and accept the standards and norms without really damaging them, and so forth." R., 91.

*Witness Ronald L. Allen*

*Direct Examination*

Dean Allen is 32 years old and holds both a bachelor's degree (1961) and a master's degree (1967). He taught for seven years in Hillsborough County. R., 94.

Dean Allen stated that 41 Plant High School students had been suspended this school year for violations of the Code. He further stated that he had undertaken a review of the records to determine their academic performance compared to that of other students at Plant High School. Most of the 41 suspended for violating the hair provisions of the Code never in fact missed any class-time.

Dean Allen had undertaken a study of the 18 seniors among the 41 boys; test scores were more readily available for the seniors. R., 98. The results he came up with were: the average grade point score of the 18 (on a 4.0 scale) was 1.870 —less than a C, which is 2.0; the average grade point score of the entire male population at Plant High School was 2.320. The score on the Florida Twelfth Grade Placement Examination of the 18

averaged 313, or 63 points above the State average of 250.

In order to determine whether these facts showed that the 18 suspended students were underachieving, Dean Allen selected at random 18 other Plant High School students who had been referred to the Dean's Office may times for disciplinary reasons *other* than long hair. R., 100. The average grade point of these students was 1.5, and their Twelfth Grade Placement Examination scores averaged 196. In response to a question from the Court, Dean Allen stated that the Placement Examination is an objective test graded by a machine, whereas grades are given by the teachers. R., 102.

Dean Allen also noted that he had made a study of the disciplinary history of the 41 students in relation to other students in general. He found that of the 41 students suspended for hair regulations, 33⅓% of the sophomores, 85.7% of the juniors, and 61.1% of the seniors had prior disciplinary records in his office. He further testified that as to the male student body as a whole, only about 12% had disciplinary records in his office. R., 102–103.

Dean Allen was unable to produce any reliable statistics showing that the 41 had less involvement in social and extracurricular activities. R., 104–105. But based on his personal observation he believed that "they would be less inclined to be involved in such activities." R., 105.

Counsel for defendant then asked Dean Allen about any incidents which may have arisen due to the long hair of the participants. He remembered an incident last spring when some students from the University of South Florida came to the Plant High School campus and passed out literature. Dean Allen had been forced to intervene to prevent violence between the college visitors and his students. The Dean was questioned about the origin of the hostility of some of his students toward the college students.

THE COURT: Was it because the South Florida students had long hair?

THE WITNESS: I think so, sir. A lot of our—some of our students were most upset. These people were there passing out literature, and many of our students were upset from their appearance. Yes, sir.

THE COURT: Oh, I see. All right.

THE WITNESS: They thought that they had no right to be on the school grounds. R., 107.

There had also been incidents connected with hair length at football pep rallies. The pep rallies had to be called off because some students were causing problems and a division within the student body. Of these students the dean said: "I think a certain number of these people were inclined to wear their hair longer." R., 108.

*Cross Examination*

On cross the Dean admitted that it was entirely possible that the problem at the pep rallies grew out of the transfer to Plant High School of a number of Blake High School students. R., 109.

The Dean was of the view that the Florida State Placement Examination was a measure of basic ability. R., 111.

When questioned about the incidents involving the visiting college students, Dean Allen recalled that the literature related to the rights of high school students. He described the visitors as being unclean; they also had long hair and were poorly groomed. He then modified his views of the origin of the trouble between his students and the visitors.

Q. Do you know whether Plant High School students were enraged at the literature or enraged at appearance?

A. I do not know that, no.

Q. Do you know if the Plant High School students were enraged because strangers were on the campus? As opposed to their mere appearance?

A. Possibly.

Q. You don't really know why the Plant High Students were upset by the presence of these persons whom you believe to have been University of South Florida students?

A. In my opinion, sir, they were upset because of the appearance of the people and their being foreign students on the campus. R., 115–116.

Dean Allen thought that perhaps six students had withdrawn from Plant High School rather than conform to the Code. He added that the grades he had hitherto mentioned were those up to June 9, 1970, the end of the 1969–1970 school year, and therefore did not reflect current grades which might be affected by suspension. R., 117.

*Further Examination*

On redirect examination, Dean Allen stated that his figures indicated that the 41 students suspended for hair length were underachieving.

*Witness Dr. Raymond O. Shelton*

*Direct Examination*

Dr. Shelton was asked what the Twelfth Grade Placement Examination indicated.

"It is a combination of aptitudes; such as intelligence; verbal and quantitative, which is the computational. And achievement.

In a sense it ends up being basically a measure of potential rather than achievement." R., 121.

*Cross Examination*

Dr. Shelton testified that the Placement Examination is scored by data processing. R., 122. The maximum possible score is 495, and some students do make perfect scores. Dr. Shelton admitted that to the extent the examination measures ability it would not accurately reflect the abilities of a person who made a perfect score. R., 122. Dr. Shelton then said that the test measures both ability and achievement:

Q. Can you differentiate between that portion of the test which measures ability and that portion of the test which measures accumulated knowledge?

A. There are separate tests involved in this test; but the achievement portions of this test are so designed to measure potential in these fields, which would be related to achievement in these fields. But, overall, it is basically a measure of potential for success in college, as one measure taken along with achievement test scores and other things, and grade points in school, to determine—as a predictor of success in college. R., 123.

*Witness Frank Scaglione*

*Direct Examination*

Mr. Scaglione is Principal of Leto Comprehensive High School; he is 37 years old and has both a bachelor's and a master's degree. Mr. Scaglione has been a classroom teacher for six years, Dean of Boys for two years, Assistant Principal for three years, and Principal for five years.

Mr. Scaglione spoke first of his role and the role of his school in the adoption of the Code. Recommendations were requested from the student council, faculty, and the administration. Leto is a comprehensive high school, which means that it has technical and vocational as well as academic programs. The school has several coordinators in these nonacademic programs who not only teach courses but go into the community and seek work stations for their students. There are also advisory groups made up of lay people who help place students. R., 127.

There are 1150 male students at Leto; 200 of them pursue vocational or part-time job training. R., 128.

Mr. Scaglione stated that it is his opinion that the Code is relevant to job placement opportunities.

"My opinion is that a Dress Code is needed in our particular school for the simple reason that we rely on these people in the advisory group and the industrial community to help place our youngsters, since they are in school part-time and seeking employment part-time; and they request that they do not send them any students that they feel will not present a good image to their program. R., 128.

Mr. Scaglione stated that the advisory groups meet once a month and "they don't want students with extremely long hair." R., 129. Some of the firms with whom students are placed do not employ persons with long hair, because they do not want their customers to be offended by employees with poor grooming. R., 129.

During the 1970–1971 school year, Mr. Scaglione testified, there have been reprimands, but no student has been suspended for failure to cut his hair. Leto has 19 consistent offenders of the Code; 15 of them have had non-hair connected disciplinary problems, a higher percentage than is the case with "normal" students. R., 130. The average grade of the 19 is D, which is below the average. R., 131. Mr. Scaglione also stated that persons with long hair "tend to cluster in groups away from the general student body." R., 131.

An incident was recalled by Mr. Scaglione which was related to long hair. Toward the end of the 1969–1970 school year, several persons were reported to be attempting to pass out literature at Leto. When he arrived at the scene, Mr. Scaglione observed that "these people were of extreme dress and long hair." R., 132.

"We had several members of the student body who did not particularly appreciate this, and we had to sort of restrain them from any kind of action. They just didn't appreciate any outsiders coming into their school to create any problems.

Q. Do you feel that this incident was attributable to the fact that they did not desire to have outsiders on the campus or was it attributable to the length of the hair of these outsiders?

THE WITNESS: General appearance, I would say. R., 132–133.

The only other incident Mr. Scaglione recollected in which long hair was involved related to an attempt to enforce the Code. Mr. Scaglione said that once, when he was being reprimanded for violating the hair provisions of the Code, a boy told a Guidance Counsellor that he was going to kill the Dean of Boys. R., 133. Mr. Scaglione knew of no incidents in three years in which a dispute among students had been related to length of hair.

Q. Have you had any incidents, Mr. Scaglione, with reference to students within the high school having arguments or any disputes regarding hair? That is, two students one against the other?

A. Not this year.

Q. Did you have any last year?

A. No. It has been about three years ago. R., 134–135.

*Cross Examination*

On cross Mr. Scaglione stated that 17 of the 19 consistent offenders are still in attendance at Leto. Yet there have been no disturbances among the student body over the matter of hair for three years. R., 135–136.

*Further Examination*

On redirect, Mr. Scaglione stated that those of the 19 now in attendance are in compliance with the Code; otherwise, they would not be there.

On recross, Mr. Scaglione clarified his remarks by saying that during the time the 19 were in a state of noncompliance there were no incidents, except the one arising out of an attempt to enforce the Code.

*Witness Lyle Flagg*

*Direct Examination*

Mr. Flagg is Principal of Brandon High School; his age is 43 years and he has a bachelor's and master's degree.

He was the Chairman of the Senior Principals Council when it undertook a conference on drawing up the 1970–1971 Code. In making recommendations, he discussed the matter with the student council, which in turn asked for help from members of the community and faculty representatives. Mr. Flagg presented his view on the basis of the recommendations he received.

During the 1970–1971 school year disciplinary action for violation of the Code has been rare, but school officials at Brandon High School have talked with about 100 students regarding possible violations. According to Mr. Flagg, who reviewed their academic performance, the average grade point of these 100 students was 1.861, whereas the average grade point for the entire male student population was 2.219. Of the 100, roughly 60 had been involved in some other form of disciplinary action; out of the entire student body, the average number of students disciplined at some time is around 32%. R., 148.

Brandon High School has two work programs in which efforts are made to place students in jobs. A total of 50 students are involved in these two programs; the total male population of Brandon is in excess of 1000. Mr. Flagg testified as to the relationship of the Code and the job programs. In talking with the teachers involved in these programs, he discovered that there are problems in placing students whose hair is in the extreme. R., 149.

Mr. Flagg was then asked if, quite aside from these programs, he had an opinion as to whether or not the Code was a necessity in the school system. He replied that he felt that the Code was necessary because you have to have rules of operation in schools, and a dress code is a part of those basic rules of operation. R., 151. Mr. Flagg went on to say that grooming rules should be obeyed because all rules ought to be obeyed: "I think we have to stay within the rules." R., 152–153.

THE COURT: You think this is a good exercise in complying with regulations?

THE WITNESS: Yes, sir. I do. R., 153.

When asked if excessively long hair is related to problems of school discipline, Mr. Flagg expressed his opinion that in violating the Code young persons were consciously announcing an intention not to comply with the rules. R., 154.

"This is perhaps some kind of badge, I guess. That is a personal opinion."

THE COURT: You think that it is a symbol of rebellion or something?

THE WITNESS: I think so, to some extent; yes, sir.

THE COURT: You think that is so now, in the year 1970?

THE WITNESS: It is probably not as much now as it may have been some time ago, because codes of society have changed somewhat in this extent. R., 154.

Mr. Flagg went on to opine that students extreme in dress or hair have a disruptive influence in the classroom for the simple reason that they are in violation of the Code; "to be in a position of noncompliance with them [the hair regulations] puts one in a position— puts a student in a position of creating a basic type of disruption within the society; in this case, the classroom." R., 155.

*Cross Examination*

In explaining his position on the Code, Mr. Flagg expressed the view that where there are rules, they should be complied with by all. In short, he maintained that rules should be obeyed, that the Code is a rule, and that therefore the Code should be obeyed.

"And this is where—if I didn't express it well—I think that what I am saying is that for students, for some students to have to comply to a policy, it is not fair for others not to have to comply."

THE COURT: Well, if you didn't have a policy at all, then that would solve that problem, wouldn't it?

THE WITNESS: Well, that is an opinion to the extent as to whether the policy ought to be there or not.

BY MR. MANEY:

Q. Would it be fair to summarize your testimony, at least to hair length regulations, that you may be neutral on hair length, but you feel the regulation is important because it instills obedience to regulations?

A. I would say that is true, yes, sir. R., 156–157.

The Court then questioned the witness about the relationship of long hair and disciplinary problems.

THE COURT: Let me ask you this. Now, you testified about your study of these male—one hundred male students, and gave the relation of their disciplinary problems otherwise.

THE WITNESS: Yes, sir.

THE COURT: Do you think those problems otherwise would be any different if they had short hair? These are all non-hair-related disciplinary problems.

THE WITNESS: I indicated that we had students who had problems with hair difficulties and they also had other disciplinary difficulties.

THE COURT: Yes.

THE WITNESS: Yes, sir.

THE COURT: Now, if they had short hair, within regulations, do you think that would have made it any better with regard to the non-hair-related disciplinary problems?

Is there any relation between the two; except a correlation that a person who has disciplinary problems is also more likely to have long hair?

THE WITNESS: I think there is some relation here, but I couldn't —I don't think that I could prove this.

THE COURT: Do you think that, say, taking all those persons and—if necessary physically giving them a haircut—would relieve the other causes of the other non-disciplinary —or the other disciplinary problems?

THE WITNESS: No, I don't think that it would relieve the causes. I think the disciplinary—their own character makeup and all the difficulties that they have had have helped to bring them to that kind of point. R., 157–158.[3]

*II. Analysis*

Based on the evidence and testimony adduced at the hearing on January 21, 1971, the Court finds that the defendant school board has failed completely to show a State interest in regulating the hair length of the students in the Hillsborough County School System. Briefly stated, the board has offered to this Court no reliable evidence that the hair provisions of the Code are necessary to alleviate interference with the educational process.

Before proceeding to discuss *seriatim* the reasons advanced in support of the Code's hair regulations, the Court observes that much of the school board's evidence consisted of the opinions of the school officials who are responsible for the promulgation and enforcement of the regulations under attack. Some of these opinions were vitiated by the officials' belief that long hair represents an undesirable attitude on the part of the student. It is remarkable that not one of the school officials who testified as to the deleterious effects of long hair was able to cite a single instance in Hillsborough County where long hair alone had created disruption among the stu-

3. Following Mr. Flagg's testimony, defendant rested. Both sides then argued their respective cases, following which the Court announced orally that a preliminary injunction would be entered.

dents or had interfered with classroom activities.

The school board offered seven grounds in support of the Code's hair restrictions. For the reasons that follow, the Court finds that none of these grounds is supported by the evidence, and that none of them justifies the board's contention that the Code is needed to prevent interference with the educational process.

### 1. *Distraction*

█ Dr. Shelton testified that in his opinion the educational process is fostered by a businesslike and pleasant atmosphere; that extreme appearances are distractive of this atmosphere; and that students extreme in appearance distract both their own learning process and the learning process of others. It was this witness' opinion that there is a direct relationship between extreme deviant appearance and behavior and conduct. Mr. Flagg testified that the Code was necessary because a school needs basic rules of operation and a hair regulation is part of these basic rules. Additionally, the witnesses for the school board related incidents in the Hillsborough County School System which they believed demonstrated that long hair disrupts school functions.

On the basis of the reasoning below the Court finds that defendant has offered no credible evidence that the wearing of long hair has caused disruption in its schools.

(a) Dr. Shelton's opinion is not persuasive because it was not based upon fact. Dr. Shelton had his last classroom experience in 1958. He was unable to specify one instance of disruption in a Hillsborough school due solely to hair worn in violation of the Code. The only incidents he could recount involved boys at Chamberlain High School who wore wigs for the purpose of distraction. The Code, of course, says nothing about boys wearing wigs with the intention of disrupting school functions.

Although he believed there were studies by professional educators supporting his position that there is a relationship between extremely deviant appearance and student conduct, Dr. Shelton was unable to name a single one.

Finally, Dr. Shelton's opinion was tinctured by his belief that long hair is associated with objectional mental attitudes. Once he referred to "a youngster [who] deliberately wears hair in an attempt to deliberately attract attention to himself," R., 72, and another time he said that "[i]t [long hair] shows a hostility to the accepted norm; hostility to the Teacher * * *." R., 84.

(b) Mr. Flagg also believes that long hair is, to some extent, a symbol of rebellion. R., 154. His views must be judged accordingly. His position that grooming rules are part of the basic operation of a school system amounts to a naked assertion, unsupported by any facts, that hair regulations are desirable and necessary. Such a position is untenable because there are school systems which function without hair regulations as a basic rule of operation.

(c) No school board witness was able to recall a single instance where long hair had disrupted school activities in Hillsborough County. Dr. Shelton's reference to the incidents at Chamberlain High School involving wigs has already been mentioned. Dean Allen mentioned an incident at Plant High School, but it involved outsiders passing out literature on the school campus. Dean Allen was unable to state that the long hair of the intruders was the cause of the trouble; at any rate, the incident involved outsiders coming onto the campus, not dissension among the students themselves.

Although Dean Allen attempted to show that footfall pep rallies had been disrupted by "a certain number of * * people [who] were inclined to wear their hair longer," R., 108, he admitted on cross that it was "entirely possible" that the transfer of a large number of Blake High School students to Plant High School was the actual cause of the dis-

ruption.[4] The Dean did not indicate how numbers of students in violation of the Code were able to congregate at pep rallies without being suspended.

Mr. Scaglione also related an incident involving outsiders visiting the Leto Comprehensive High School campus to pass out literature. However, he testified that the "general appearance" of the intruders was the cause of the trouble between the visitors and his students; he did not allege that the long hair of the visitors had been the origin of the disruption. The only other incident Mr. Scaglione mentioned involved an effort to enforce the Code—namely, the occurrence at Leto Comprehensive High School, when a boy being reprimanded for violating the Code told a guidance counselor that he was going to kill the Dean of Boys.[5]

The testimony of the school board's witnesses at times conflicted with their own position that long hair is disruptive. Apart from the wigs incidents, Dr. Shelton stated that to his knowledge there had been no disruptive scenes caused by bizarre appearance in the last four years.[6] Mr. Scaglione stated categorically, in response to a question from his school board's own lawyer, that there had been no disputes among students at Leto High School involving hair for about three years. This was true despite the fact that for a time around 19 students were consistent violators of the Code.

4. The undersigned has presided over the desegregation of the Hillsborough County School System. See Mannings v. Board of Public Instruction of Hillsborough County, D.C., 306 F.Supp. 497. Under a desegregation plan submitted by the school board and approved by the Court, a number of students at black Blake High School were zoned into the attendance boundaries of predominately white Plant High School for the 1970–1971 school year.

5. This Court distinguishes "between disruption which may be caused by the wearing of long hair, on the one hand, and disruption which may be caused by the very fact that a student has violated any Board rule, on the other. That disruption of the latter type may occur obviously affords no support for constitu-

## 2. *Origins of the Code*

■ Defendant argues that the Code is to be upheld because of the elaborate, participatory way in which it was adopted. But a regulation impinging upon constitutional rights cannot be justified on the basis of the procedural machinery which led to the regulation's adoption.

"As stated by this Court in West Virginia State Board of Education v. Barnette, 319 U.S. 624, 638 [63 S. Ct. 1178, 87 L.Ed. 1628] (1943), 'One's right to life, liberty, and property * * * and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.' A citizen's constitutional rights can hardly be infringed because a majority of the people choose that it be." Lucas v. Forty-Fourth General Assembly of Colorado, 377 U.S. 713, 736–737, 84 S.Ct. 1459, 1473–1474, 12 L.Ed.2d 632 (1964).

The Fifth Circuit Court of Appeals has held that the touchstone for sustaining hair regulations is the demonstration that they are necessary to alleviate interference with the educational process. This Court finds that the Code cannot be sustained on the basis of its origins. The Code can be sustained only upon a showing that it is necessary to prevent education disruption.

tionality of the regulation itself." Breen v. Kahl, 296 F.Supp. 702, 708 n. 8 (W.D. Wis.1969).

6. Dr. Shelton reasoned that there could be no disruption caused by bizarre appearance since the Code forbids bizarre appearances. The Court cannot accept the view that there have been no students in attendance recently not in compliance with the Code. Minor plaintiffs herein attended Plant High School from September to November 1970, although they were in violation of the Code. Mr. Scaglione stated that during the 1970–1971 school year there had been 19 consistent offenders of the Code at Leto High School. R., 130. Mr. Flagg stated that during this school year officials have talked with 100 students regarding possible violations, (R., 145,) at Brandon High School.

### 3. *Teaching Norms*

Dr. Shelton testified that one of the reasons underlying the Code was an effort to let young people know that there are norms and values in society, and that there are consequences if one deviates from the norm. He felt that by having the grooming regulations the students had an opportunity in the protected atmosphere of the schoolroom to learn the consequences of deviation. R., 75, 80–81.

■ Treating this novel explanation of hair regulation as worthy of serious refutation, the Court finds it to be unacceptable. The Fifth Circuit, it is reiterated, requires that school authorities show that a hair restriction is needed to avoid interference with the educational process. To prove that the Code inculcates an awareness that there are norms in society is not to prove that the Code is necessary to alleviate interference with the educational process. Therefore, assuming but not deciding that the Code serves the function of teaching norms, the school board has nevertheless failed to justify the regulation, since it is not necessary to inculcate norms to avoid interruption of the educational process.

Assuming that high school students do not already have enough rules, regulations, and laws to comply with, it appears to the Court that by enforcing its hair Code the school board is actually entrapping students by a series of events which force the students either to give up what they believed to be their constitutional right, or to violate a rule which is unnecessary and repressive. Instead of teaching obedience to society's standards, therefore, the school board may in reality be generating a disrespect for the laws which are supposed to embody norms.

There is no reason why a school board may not inculcate a knowledge of society's norms without violating the students' federally protected rights. Defendant board may teach its students that society penalizes extreme deviants without itself administering punishment. The board may teach that society ostracizes deviants without acting in the same way. The Court finds that defendant, an arm of the State of Florida, cannot justify a deprivation of a constitutional right on the ground that society in general imposes sanctions upon those who deviate from its norms.

### 4. *Underachievement*

■ By use of grades, test scores, and statistical evidence defendant's witnesses attempted to demonstrate that persons violating the hair provisions of the Code are not achieving to the extent of their ability. At Plant High School defendant sought to show that long-haired students did not measure up to the potential indicated by their Florida Twelfth Grade Placement Examination and that their grades were below average. The school board's witnesses testified that at Leto Comprehensive High School and Brandon High School the average grade of violators of the Code was below the average grade of the entire male student body.

The Court finds these figures to be insufficient to justify the hair regulation for these reasons:

(a) The accuracy of the sampling has not been proved. At Plant High School there were 41 persons suspended this school year for hair violations, but the study of grades was limited to the 18 seniors, whose test scores were more readily available. At Leto High School, where no student has been suspended this year for violating the Code, the sampling of long-haired students was drawn from a list of 19 "consistent offenders". The sample of long-haired students at Brandon High School was made up of 100 students who had been "talked to" about possible violations of the Code. The Court therefore does not know if the students selected to represent Code violators were objectively chosen, or even if all the persons so selected were in fact violators of the Code.

(b) In calculating underachievement at Plant High School, defendant used

the Florida Twelfth Grade Placement Examination as an indicator of ability. But Dr. Shelton testified that the test measures both ability and achievement, and that it is impossible to differentiate between the portions of the test that measure ability and those that measure achievement. The Placement Examination is therefore not a pure measure of ability, as is the case with an I.Q. examination.

(c) In making their calculations defendant's witnesses used student grades as a measure of achievement. Yet whereas the Placement Examination is an objective test scored by a machine, grades are given by the very teachers who enforce the regulation. Dean Allen testified that both times he talked with Larry it was because of referrals from the faculty. There is no way of determining to what extent grades are affected by the teacher's attitude toward long hair or toward the fact that a student is in noncompliance with the Code. Nor is it possible to determine to what extent a student's grades are affected by the psychological consequences of being referred to the Dean of Boys by one's teachers, being called to the Dean's office and told to trim the hair, or being "talked to" concerning hairstyle.

(d) The school board's figures suffer from a basic fallacy in logic. There is no correlation of long hair with underachievement. The board first advances statistics purporting to show that long-haired students have better than average abilities. The board then tries to show that these students' grades are less than average and are not up to their abilities. The board then proposes that the reason for this underachievement is the length of the students' hair.

Actually, the evidence indicates only that long-haired students do better on a uniformly administered, objective, machine-graded examination than they do in classrooms in which they are subject to discipline on account of their physical appearance and where their violation of the Code may affect their grades.

■ Even if the board had established, which it did not, that students with long hair underachieve, the school board offered no evidence to support the proposition that they underachieve *because* of their long hair. The board did not demonstrate that long-haired students make lower grades than they should or than their peers as a *result* of their hairstyle. This being so, the board also failed to demonstrate that students who were forced to cut their hair would begin to achieve according to their abilities.

■■ (e) Finally, even if the school board is correct and students with long hair underachieve because of their hair, the regulation would still fail. The Fifth Circuit requires a showing that a hair regulation is needed to alleviate interference with the educational process. Underachievement does not interfere with classroom activities; it is not disruptive. Of course it would be best for all concerned if all students achieved up to their potential. But the interest of the State in obtaining fulfillment of potentiality does not justify a curtailment of the right of an individual to choose his own hairstyle; it is only the interest of the State in preventing disruption of the classroom that can do this.

5. *Disciplinary Problems*

■ Defendant school board contended that its statistics indicated that long-haired students had more discipline problems unconnected with the hair regulation than other students. The statistics offered in support of this proposition suffer from the same defects as those offered above in an attempt to demonstrate that violators of the Code underachieve.

Mr. Flagg testified that he thought there was "some relation" between long hair and discipline problems, but that he could not prove this. R., 158. He also

stated that cutting the hair of these students would not relieve the causes of their nonhair-connected discipline problems. R., 158.

### 6. Social Adjustment; Clannishness

By adducing statistics and testimony, the school board tried to show that students in violation of the hair regulation tend to be socially maladjusted and to cluster in cliques. The Court finds that the statistics are unconvincing for the reasons given above in 4. and 5., and that the testimony is unpersuasive.

### 7. Job Training

The school board tried to demonstrate that the hair regulation is relevant to job placement opportunities. Mr. Scaglione testified that at Leto Comprehensive High School there are educational and technical programs. Coordinators both teach and seek work stations for students, and advisory groups made up of lay citizens also help place students in jobs. Mr. Scaglione further testified that people on the advisory group and in the industrial community do not want to be sent students with long hair. Mr. Flagg stated that at Brandon High School there are two work programs in which efforts are made to find jobs for students. In talking with those who teach these programs, Mr. Flagg discovered that "they do have problems in placing students if their hair is extreme." R., 149. Indeed, Mr. Flagg thought that "it is easier to place them if their haircut is more moderate than actually the school system code." R., 149.

Assuming but not deciding that it is easier to place students with short hair and that students should be constrained to cut their hair to avoid offending the industrial community, the board has nevertheless failed to justify the hair restriction because said restriction is not limited to male students in job training or male students in job training who are to be interviewed by prospective employers who dislike long hair. Instead, the regulation applies to *all* male students, regardless of whether they are in an academic or a nonacademic program.

Leto Comprehensive High School has 1150 male students, only 200 of whom pursue vocational or part-time job training. R., 128. Brandon High School has around 1000 male students. Only 50 of them are in job programs. R., 144, 150. This Court finds that defendant cannot justify the hair regulation on the ground that it is relevant to job placement when the overwhelming majority of the students involved are not seeking job placement. The school board has advanced no reason why the regulation, assuming it to be essential to job training programs, ought not to be confined to those who are in such programs.

## CONCLUSIONS OF LAW

The Court supplements its prior conclusions of law, as follows:

### Nature of Right Involved

At the end of plaintiffs' case defendant moved to dismiss, and oral argument ensued. It was defendant's position that minor plaintiffs had failed to show that any constitutional right of theirs was infringed when they were suspended on account of their hair length.

The Fifth Circuit, whose decisions are binding on this Court, has never ruled explicitly on the question of whether the right to wear one's hair in any desired manner is a fundamental right guaranteed by the United States Constitution. Nevertheless, that court has indicated that there is such a right.

In Ferrell v. Dallas Independent School District, 392 F.2d 697 (5 Cir. 1968), the panel assumed, although it did not decide, that a hair style is a constitutionally protected mode of expression. The panel then upheld a hair regulation on the general ground that constitutional rights may be abridged where there is a compelling reason for State infringement; and the compelling interest was found to be the State's interest in an effective and efficient school system.

In Griffin v. Tatum, 425 F.2d 201 (5 Cir. 1970), the appellate court again upheld a hair regulation where the undisputed evidence showed that long hair on boys was disruptive. The appellate court summarized the rule of *Ferrell* in these words: "The touchstone for sustaining such regulations is the demonstration that they are necessary to alleviate interference with the educational process." 425 F.2d at 203.

Other circuits have held that the right to wear one's hair at any length or in any desired manner is an ingredient of personal freedom guaranteed by the federal Constitution. See, e. g., Richards v. Thurston, 424 F.2d 1281 (1 Cir. 1970); Breen v. Kahl, 419 F.2d 1034 (7 Cir. 1969); Crews v. Cloncs, 432 F.2d 1259 (7 Cir. 1970).

This Court concludes that the right to wear one's hair at any desired length or manner is a federally protected right. If this conclusion were incorrect, then the Fifth Circuit would not have required a showing of interference with the educational process for a hair regulation to be sustained. Stated differently, there would be no reason for the courts to require evidence of classroom disruption if individuals did not have the right to wear their hair as they wish; a compelling State interest is needed only where the State encroaches upon personal freedoms, i. e., constitutional rights. Whether this right is characterized as protected by the First Amendment (freedom of expression), the Ninth Amendment (penumbral rights), or the Fourteenth Amendment (right to reasonable and nonarbitrary classification) is of no import; the fact remains that hair style is a right because the Fifth Circuit permits it to be regulated only upon a showing of a subordinating State interest.

*Exhaustion of State Administrative Remedies*

All the parties agree and the record and file in this case support the finding that plaintiffs herein have exhausted their state administrative remedies.